616 P.2d 30

**STATE of Arizona, Appellee,**

v.

**Frank EBNER, Appellant.**

No. 4891.

Supreme Court of Arizona,
In Banc.

June 25, 1980.

Rehearing Denied Sept. 4, 1980.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Gerald R. Grant, Asst. Attys. Gen., Phoenix, for appellee.

Harold A. Donegan, Jr., Scottsdale, for appellant.

STRUCKMEYER, Chief Justice.

This is an appeal from a jury's verdict of guilty to three counts of grand theft by false pretenses in violation of A.R.S. §§ 13–661(A)(3), 13–663, 13–671, 13–139 and 13–140, and one count of conspiracy in the second degree, a violation of A.R.S. § 13–331(B) as amended in 1971. Jurisdiction was accepted pursuant to Rule 47(e)(5), Rules of the Supreme Court, 17A A.R.S. Affirmed in part and reversed in part.

On appeal, Ebner argues that the trial court erred in failing to grant his motions for directed verdicts of acquittal on the counts of Grand Theft by False Pretenses, Counts III, V and VII, at the close of the State's case, and, again, at the close of all the evidence.

In November 1973, Cholla Land & Cattle of Arizona, a limited partnership, purchased a parcel of land called "Stonewood Ranch" in northern Arizona with the objective of subdividing it into 40–acre parcels. The general partner of Cholla Land & Cattle

(herein called Cholla) was Saguaro Land and Cattle Co., also a partnership, and the limited partner was Danny O'Keefe, a codefendant with Ebner. Ebner and three other salesmen were equal partners in Saguaro Land and Cattle Company. Legal title to "Stonewood Ranch" was held by Minnesota Title through a trust deed arrangement in which Lynch, the seller, was first beneficiary, and Cholla, as buyer, was second beneficiary. Pursuant to the terms of the trust, Cholla had the right to sell parts of the property to third parties and in accordance with the release provisions, the purchasers would receive legal title to separate 40-acre tracts upon payment for each parcel. When a parcel was sold, the down payment and thereafter the monthly payments were deposited with the Minnesota Title. That company disbursed the funds to Lynch and Cholla as first and second beneficiaries pursuant to the trust agreement. Upon final payment by the purchaser, legal title was transferred from Minnesota Title to such purchaser.

The first contact with a purchaser was usually made through classified advertisements placed in newspapers outside Arizona. The advertisement directed interested parties to call an Arizona telephone number. Following a salesman's telephone conversation with the potential purchaser, a packet containing sales brochures, a completed "Agreement for Deed" and a letter of instructions signed by the salesman was sent to the potential purchaser. The Agreement set forth, among other provisions, the legal description of the particular 40-acre parcel being sold and a 30-day inspection privilege. This information was also supplied:

```
"1. Cash Price ............................$8400.00
 2. Down Payment
    (a) Earnest money ...........$ 206.88
    (b) Balance of down payment ..$1197.12 Disc. by Credit
    (c) Total down payment ....................$1404.00
 3. Unpaid Balance of Cash Price ..............$6996.00"
```

The letter of instruction also noted that if on inspection within 30 days the purchaser was not satisfied, all monies paid would be refunded.

■ In Arizona it is settled that for the offense of grand theft by false pretenses to occur there must be (1) a false representation as to an existing or past fact, (2) the false representation must have been made prior to obtaining the property from the victim, and (3) the victim must have relied upon the false representation in parting with his property. See *State v. Brown*, 97 Ariz. 310, 400 P.2d 111 (1965); *Maseeh v. State*, 46 Ariz. 94, 47 P.2d 423 (1935); *Jacobson v. State*, 24 Ariz. 402, 209 P. 310 (1922); *Willis v. State*, 34 Ariz. 363, 271 P. 725 (1928).

■ The State presented its case of theft by false pretenses, Count III, principally through the testimony of Walter Griffin, the purchaser of one 40-acre tract. In this Count, the State failed to carry its burden of showing that the victim relied on false representation in parting with his money.

Assuming, without at this point deciding whether either the newspaper advertising or the contract itself falsely represented the property to be a repossessed parcel or otherwise indicated there was accumulated equity at the time of the sale, there was no reliance by Griffin on this fact at the time he purchased his 40-acre parcel.

Griffin, although living in California, had engaged in real property sales in Arizona for many years. His testimony reveals that he had owned "properties on and off in various parts of Arizona since 1950s, and I have never seen anything for sale in the last ten years for $200 an acre that amounted to anything." He testified on direct examination:

"Q. And it indicates on there, that contract, you got some type of a discount.

A. It seems to me that was one of the kinds of come alongs that was indicated in the original ad, that there were going to be a discount for some reason. I was never too sure why.

Q. Does this contract indicate you received some type of discount * *?

A. I'll have to look at it to see. Surely doesn't seem to indicate any discount.

* * * * * *

Q. Now, did you understand the discount to be the equity that some other individual had paid in?

A. That is correct. This has been a defaulted contract.

Q. And that was in accordance with the ad that you read about the property that indicated some type of a default?

A. What attracted me was that I could pay $200 an acre and buy 40 acres in Arizona regardless of how it was done. I wasn't all that concerned with the other ramifications.

* * * * * *

Q. When you made the purchase in December of the 40–acre parcel, was the fact that you–that there was some equity, that there was $8400 parcel that you would be getting for approximately $7,000, did that have some bearing in your purchase of the property?

* * * * * *

A. First parcel. No * * * I was attracted simply by the price per acre of this raw desert ground.

Q. So the fact that the discount brought it down to $200 an acre attracted you to purchase that piece of property?

A. If we can say that it brought it to that $200 price, perhaps. In all honesty, if we would take the difference and add that $200 to the acre, I would have been interested. I would have been interested in anything under $400 an acre, very frankly."

Under cross–examination, he further testified:

"Q. Based on your experience and knowledge of land values, was that price a very good value for that type of land?

A. I believe it was yes. I still do at that price if it were accessible.

* * * * * *

Q. * * * as I understand your testimony, the sole and exclusive basis for your purchasing this property was the price that you paid for it with respect to the land you actually saw, is that correct?

A. That's right, yes."

It appears that the prosecution failed to show Griffin relied upon anything other than his own experience and appraisal of the property in entering into the transaction. Even if it were to be assumed that either the contract or the newspaper advertisement contained false representations, absent a showing of a reliance on such representation, all elements of the crime have not been established.

The State also urged that there were false representations made relative to access to the property. "Stonewood Ranch" is bound on the west by the Petrified Forest National Park and on the north by Interstate 40, a controlled access highway. When potential purchasers came to view the property, a representative of the Cholla Land and Cattle Company generally would meet them in Holbrook, drive them east on I–40 and enter "Stonewood Ranch" through a gate off the south side of the highway. After the sales with which this case is concerned, the gate off I–40 was locked by the government, thereby eliminating this access to the "Stonewood Ranch."

A.R.S. § 13–661 requires that Ebner "knowingly and designedly" defrauded another of money or property. The State does not indicate, and in our examination of the record we do not find, any evidence which establishes that Ebner knew that there was a limited right of access from I–40 prior to or at the time of the sales in question. While access through the I–40 gate was limited to five vehicles a day, the limit was not enforced and, in fact, the gate was not closed until the summer of 1976. A.R.S. § 13–661 requires a specific criminal intent. The accused must "knowingly and designedly" defraud another by false representations. Therefore, absent a showing that Ebner *knew* of the limited access right prior to or at the time of the sales in question, there can be no criminal culpability. The State's failure to show that Ebner knew the access to be limited is fatal, and

precludes a showing that he made a false representation sufficient to give the case to the jury. The denial of a directed verdict on Count III was error and requires reversal.

Count V of the indictment concerned the sale of property to Gary Reihart in February 1974. Reihart testified that he spoke to Ebner by telephone in response to a newspaper advertisement:

"A. * * * He told me that somebody had purchased it prior and that they couldn't make the payments and I could take over the property by just picking up the unpaid balance.

* * * * * *

Q. Were the statements made to you—other statements made to you by [Ebner] concerning roads and other things also a factor?

A. Yes, I was told that the area was developing very rapidly and that the land values were going to go up greatly in the next few years and that this area was right in the growth pattern and that I should be able to make a, you know, a large profit."

On cross–examination, Reihart testified:

"THE WITNESS: The conversation that I had on my initial contact with [Ebner] was that a lady had originally purchased it and I think she was going through a divorce and was forced to sell it. It was a forced sale."

■ The State, in proving theft by false pretenses when the false pretense was expressed in language unaccompanied by a false token or writing, has the burden of showing that the pretense, or some note or memorandum thereof, is in writing, subscribed by or in the handwriting of defendant, or prove the pretense by the testimony of two witnesses, or that of one witness and corroborating circumstances. A.R.S. § 13–664. The false representations upon which the State relied occurred during a telephone conversation between Reihart and Ebner. That the prior purchaser couldn't make the payments was a pretense "expressed in language unaccompanied by a false token or writing" and was not "proved by the testi-

mony of two witnesses, or of one witness and corroborating circumstances."

In *State v. Holmes,* 106 Ariz. 202, 206, 472 P.2d 71, 75 (1970), we said:

"Undoubtedly the legislature was recognizing the danger of permitting a conviction of theft by false pretenses on the testimony of a complainant. There is the danger of misunderstanding of an agreement of the parties, and as stated by Judge Donofrio, in the special concurring opinion:

' * * * a person who has lost property may become prejudiced and may therefore easily misrepresent facts. To protect against this, the actual fact of the misrepresentation must be corroborated. * * * ' *State v. Holmes,* 11 Ariz.App. 433 at 437, 465 P.2d 372 at 376.

Our legislature has provided that in proving guilt of theft by false pretenses it must be by two witnesses, or testimony of complainant must be corroborated. This corroboration may be by corroborating circumstances; however, those circumstances must be such that they would equal the testimony of a second corroborating witness in regard to the falsity of the alleged false representation. If it is intended to be corroborated by testimony of a second witness, it is not enough to show merely by another witness that the accused talked with the complaining witness. The testimony of the corroborating witness must corroborate the testimony of the complainant in regard to the false statement." (Citations omitted.)

Reihart was not corroborated with regard to his conversation with Ebner. No other evidence as to the claimed representation made by Ebner was introduced by the State to corroborate Reihart's testimony. The trial court's denial of the motion for a directed verdict on Count V was error.

Count VII, on which Ebner was convicted, relates to theft by false pretenses in selling property to Alfred Lake. Here again, the record fails to show the presence of all requisite elements. Neither reliance on the representations nor corroboration of the verbal representations which are

claimed to be false are present. Lake testified:

"Q. After you viewed the property, what did you do?

A. I talked it over with my wife and we decided to go ahead and take it.

\* \* \* \* \* \*

Q. When you purchased this property, did you rely upon the fact that there would be roads and that you were getting some equity?

A. Absolutely."

But on cross–examination, Lake testified:

"Q. Mr. Lake, could you tell me what it is in the way of equity you were expecting?

A. It was long term investment was my major objective when I purchased the property.

Q. The type of equity that you would obtain by an increase in value?

A. Absolutely.

Q. There wasn't any particular equity that would have existed at the date you purchased it, though, right?

A. Would you rephrase that sir? \* \*

Q. I'll restate it. Were you relying on the fact there there was–such a fact that there was a certain amount of equity that you were buying on the date you bought by paying something on the contract?

A. Not equity in itself, no."

And, on redirect:

"A. \* \* \* when I talked with [Ebner], this $207 that I was suppose to pay, or whatever the amount was, it was related to me that those were the back payments that hadn't been made on the property since the property was released from the other person.

\* \* \* \* \* \*

Q. Why didn't you ask for your money back at the time you went out there and inspected?

A. When I first inspected the property, I was satisfied that it was as it was stated to me."

■ We have searched the record and we cannot find sufficient evidence to support a charge brought in view of A.R.S. § 13–664 which requires that the asserted false representation be accompanied by a false token or writing. The newspaper advertisement of which Lake testified was not produced. In any event, Lake's major objective was for long–term investment, a building of equity which would result from appreciation. He relied on his personal inspection of the property in entering into a purchase contract and in parting with his money. The trial court's failure to grant Ebner's motion for a directed verdict on Count VII was error.

Ebner's final assignment of error, relative to the convictions of grand theft by false pretenses, is that the trial court improperly instructed the jury as to the elements which must be shown pursuant to A.R.S. § 13–661.

The challenged instruction, based on California Criminal Jury Instruction No. 14.10 as modified, was given over the specific objection that it did not correctly state the requisite elements in that it permitted a conviction upon a finding that Ebner made a promise without an intention to perform the promise made, "That defendant made or caused to be made by word or conduct a promise without an intention to perform \* \* \*."

■ The elements of theft by false pretenses are set forth in A.R.S. § 13–661. This Court has held that the false representation upon which the offense is based must be a present or past fact. See *Maseeh v. State*, 46 Ariz. 94, 47 P.2d 423 (1935); *Jacobson v. State*, 24 Ariz. 402, 209 P. 310 (1922); and *State v. Brown*, 97 Ariz. 310, 400 P.2d 111 (1965). In *Maseeh*, the Court had the opportunity to hold that a promise to do something in the future with no intention to perform the promise could be a false representation or pretense; however, it refused to do so, saying:

"\* \* \* the false pretenses on which the information under such section [Sec. 523 of Penal Code of 1913] is based must

be of an existing or past fact, and cannot be predicated upon promises to be performed in the future, * * * " 46 Ariz. at 96, 47 P.2d at 424.

In limiting false pretenses to present or past facts, this jurisdiction is aligned with the majority. See, e. g., *Indemnity Ins. Co. v. Pioneer Valley Savings Bank*, 343 F.2d 634 (1965); *Commonwealth v. Bomersbach*, 224 Pa.Super. 40, 302 A.2d 472 (1973); *Youngker v. State*, 215 So.2d 318 (Fla. 4th DCA, 1968); *Martin v. State*, 379 So.2d 179 (Fla.App.1980).

■ The State argues that the instruction is not in conflict with the law in Arizona since the instruction was taken from the California Criminal Jury Instruction and was based upon California Penal Code § 484, which is similar to A.R.S. § 13–661. Two California cases are cited,[1] which hold that a promise made without an intention to perform is a false pretense because it misrepresents an existing fact, a state of mind. From this, the State argues that the trial court's instruction is not in conflict with the Arizona law. We do not agree. Even though the Arizona statute was adopted from California, we are not absolutely bound to follow the construction of another state but may construe a statute in accordance with justice and public policy. *State v. Culver*, 103 Ariz. 505, 446 P.2d 234 (1968). And this State has already held that false pretenses must be of an existing or past fact. *Maseeh*, supra.

■ The instruction allowing the jury to find Ebner guilty of conduct which was not an offense in Arizona was error.

Ebner finally argues that the trial court erred in denying his motion for a directed verdict on Count XIII, Conspiracy to Commit Grand Theft by False Pretenses in violation of A.R.S. §§ 13–331(B), 13–661(A)(3), 13–671 as amended 1967, 13–138, 13–139 and 13–140.

In *State v. Dupuy*, 116 Ariz. 151, 153, 568 P.2d 1049, 1051 (1977), this Court set forth the elements of a conspiracy:

"We have held that the gist of a conspiracy is the unlawful combination and agreement, * * * and that the object of the conspiracy must be criminal * * It is also essential that an overt act by one or more of the conspirators to effect the object of the conspiracy be alleged and proved, A.R.S. § 13–333.

An overt act has been defined by this court as:

'an act done by one of the parties to carry out an intent, and it must be such as would naturally effect that result; at least, it must be a step toward the execution of the conspiracy.' * * *

The overt act need not itself be criminal, * * * as long as it is shown that the conspiracy has gone beyond the agreement to commit the offenses * * * " (Citations omitted.)

■ The State presented evidence showing (1) Ebner negotiated the sales with knowledge that they were sales from the Cholla partnership assets and not, as advertised, re-sales or assume payment sales; (2) that he and his codefendant formed a partnership, the purpose of which was to "buy, subdivide or divide and sell real property"; (3) that there were advertisements in newspapers of which Ebner was aware which falsely implied that the property to be sold was a re-sale; (4) that the newspaper advertisements falsely represented that "No down payment" was required, thereby implying that a purchaser would be "assuming" a prior sale. Such an evidentiary showing is sufficient to support the jury verdict of guilty of conspiracy to commit grand theft by false pretenses. The trial court correctly denied appellant's motion for a directed verdict as to this.

ORDERED: Judgment affirmed as to Count XIII and reversed as to Counts III, V and VII.

HAYS, CAMERON and GORDON, JJ., concur.

HOLOHAN, Vice Chief Justice, concurring and dissenting.

The single issue in the majority opinion with which I find myself in disagreement

---

1. *People v. DeCasaus*, 194 Cal.App.2d 666, 15 Cal.Rptr. 521 (1961), and *People v. Ashley*, 42 Cal.2d 246, 267 P.2d 271, *cert. denied* 348 U.S. 900, 75 S.Ct. 222, 99 L.Ed. 707 (1954).

concerns the challenged instruction based on California Criminal Jury Instruction No. 14.10. In my view the giving of the instruction was not error.

This court in 1935 decided that a false representation must be based on a present or past fact that could not be predicated upon a promise to be performed in the future. *Maseeh v. State*, supra. I do not believe that the statute on false pretenses should have been limited as was done in *Maseeh*. The California decisions appear to present the better view that a promise without any intention to perform is in fact a false representation. See *People v. De Casaus*, supra, and *People v. Ashley*, supra.

The revision of the criminal code has resulted in the adoption of the California rule, so offenses committed after October 1, 1978, will be subject to a broader definition of what constitutes criminal misrepresentation. See A.R.S. §§ 13–1801(3) and 13–1802(A)(3).