647 P.2d 1165

The STATE of Arizona, Appellee,

v.

Royce Emmonds AGNEW and Roger
Leroy Beck, Jr., Appellants.

Nos. 2 CA–CR 2303, 2 CA–CR 2306.

Court of Appeals of Arizona,
Division 2.

April 21, 1982.

Rehearing Denied May 28, 1982.

Review Denied June 22, 1982.

568

Robert K. Corbin, Atty. Gen. by Bruce M. Ferg, Asst. Atty. Gen., Tucson, for appellee.

Carmine A. Brogna, Tucson, for appellant Agnew.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P. C. by Michael J. Meehan, Tucson, for appellant Beck.

## OPINION

BIRDSALL, Judge.

The appellants, Royce Emmonds Agnew and Roger Leroy Beck, were tried together in Pima County in this securities fraud case. Agnew was adjudged guilty and sentenced on 23 counts of securities fraud, A.R.S. § 44–1991,[1] 8 counts of grand theft by false pretenses, A.R.S. § 13–661(A)(3), 1 count of conspiracy, A.R.S. § 13–331(B), 1 count of false filing, A.R.S. § 44–1992, and 3 counts of embezzlement, A.R.S. § 13–681. The jury found him not guilty of 2 counts of grand theft and the trial court set aside one other guilty verdict of grand theft. Some other charges were dismissed by the court prior to submission to the jury. Concurrent sentences of 7 to 8 years in prison were imposed.

Beck was found guilty of one count of securities fraud. He was found not guilty of one other count of securities fraud and 3 grand theft counts. The trial court directed a verdict on the conspiracy count with which he was charged, and dismissed that count as to him. He was placed on probation with no jail time.

Eight defendants were originally indicted by the state grand jury on November 15, 1978. Three entered pleas prior to the first trial of the case, which ended in a mistrial. By the second trial all the defendants except Agnew, Beck and one other defendant, whose case was dismissed because of his terminal illness, had entered pleas.

Some background is necessary before we discuss the issues raised by the appellants. In 1969 Common Trust 1212 was created as an investment trust. Great Southwestern Trust Corporation served as the corporate trustee of 1212. This was the only activity of the corporation. Individual investors would sign an investment contract called a Trust Indenture, which stated the interest rate to be received by the investor and authorized the Trust Corporation to pool the funds with other similar trust indentures. These investment devices were sold, primarily in Tucson, through the fall of 1972. Investments in real estate or related activities were contemplated.

The principals (two of the other defendants) also owned a small mortgage company called Pima Mortgage Company. In late 1972, Royce Agnew joined the organization. They incorporated a new entity, Twin City Development Company, and expanded their lending activity from mortgage placement fundings into the area of interim construction financing. They also entered into an agreement to purchase an existing VA/FHA mortgage company, Realty Mortgage Company.

Great Southwestern Corporation was next formed to be a holding company for all the existing corporate entities. It was determined that the trust indentures were securities required to be registered under the Arizona securities laws and in December, 1972, the first registration application was filed with the Securities Division of the Arizona Corporation Commission. The securities were duly registered by qualification in January of 1973. This registration was renewed in January, 1974, and January, 1975. In March of 1976, the Trust Corporation defaulted on interest payments to investors in 1212. This was followed by proceedings under the federal bankruptcy laws and an investigation by the Securities Division of the Arizona Corporation Commission.

The only assets of G.S.C. were stock in the various subsidiaries. It operated at a loss throughout its history.

Twin City Development Company developed a single project, Valle Cereza, a townhouse project on Prince Road in Tucson. The project was plagued from the beginning by poor design, construction delays,

---

1. Unless otherwise indicated, all references are to statutes in effect before the extensive revision of the criminal code effective October 1, 1978.

and cost overruns. Poor sales resulted in further delays which caused interest and carrying costs to eat up the project funds. As early as June of 1973, it was predicted that the project would result in substantial losses, and these predictions proved to be accurate.

Another affiliate, Dennis Development Company, was a Phoenix construction company acquired in 1973. It was insolvent at the time it was purchased and continued to incur substantial losses.

Pima Mortgage Company was an inactive, assetless shell. Its function was merged with that of Realty Mortgage Company and in essence it ceased to exist. Realty Mortgage Company was an active mortgage brokerage agency with $250,000 in assets when acquired in 1972. These assets were used to pay the acquisition costs, impairing the company's capital position. As a result it operated at a loss beginning in 1973.

Over its complete life, Trust 1212 had a total of slightly less than $4,000,000 in investment capital and approximately 375 investors. At first these investors received fixed interest payments varying from 7% to 9% depending on the date of investment and on the account funded. A portion of these funds was used to fund mortgages placed by Realty Mortgage Corporation. This was short-term financing on home mortgage purchases of existing houses. This activity was reduced as 1212's cash position deteriorated. The remaining 1212 funds were loaned out in various ways, including construction loans to Owens Development Company in Sierra Vista. Owens was loaned approximately 25% of the total fund balance. It was unable to pay off these loans and was in continuous financial difficulty from 1973 on. Unpaid interest on these loans was capitalized and "rolled over" into new notes. The trust recognized income from this process and paid trustees' fees and investor interest from this "income" despite the fact that it had not been received. The ability of Owens to repay the loans became increasingly questionable from early 1973 on.

Approximately 30% of 1212's assets were loaned to affiliate organizations, primarily after June, 1973. These loans were either inadequately secured or completely unsecured. The borrowed money was used to pay payroll and administrative expenses of the various subsidiaries and the parent corporation. When these loans were made, the entities receiving the funds were without substantial assets or income and unable to repay the loans.

The controlling documents of 1212 contained two major provisions designed to protect investors. First, investors were guaranteed the interest stated in the individual trust agreements. The Trust Corporation contracted to make up from its own funds, even though it had little, any amount by which 1212 common investment income was insufficient to meet the individual interest agreements of the various investors. Second, although self-dealing was allowed in the investment contract, investments in affiliated companies were required to be on the same basis as arms-length transactions and were limited to 15% of the total value of the investment pool.

In preparing the audit for the fiscal year ending June 20, 1973, the auditors noted that the financial condition of the Trust Corporation had deteriorated. Not only was it operating at a continuing and increasing loss, but virtually all of its approximately $130,000 in assets consisted of unsecured obligations of the parent company, G.S.C. The auditors were concerned that, in the event of a deficiency in common trust income, the Trust Corporation would be unable to make good on the guarantee. As a condition precedent to the issuing of an unqualified opinion on the financial statements of the trust, the auditors insisted that the funds advanced to the parent be repaid to the trust corporation. This was accomplished as follows.

In April, 1974, Thomas Cox, the firm's attorney, asked to borrow $125,000 from 1212 to finance the construction of a mobile home park ("The Ranch"). He was asked, and agreed, to borrow an additional $100,-000 and lend it to Agnew and another offi-

cer. They then loaned the money to G.S.C., which in turn repaid $100,000 in loans to the Trust Corporation. The Trust Corporation then loaned $100,000 to 1212. Since all of the transfers took place within 24 hours, the $100,000 never actually left the Trust. Agnew received a $1,000 commission from this transaction.

The 15% limitation on loans to affiliates was greatly exceeded because of the borrowing of trust funds by the officers, including Agnew, after June 30, 1973. In preparation for the end of the fiscal year on June 30, 1974, and the upcoming audit, they arranged to transfer Realty Mortgage Company from G.S.C. to 1212. Realty Mortgage Corporation had been purchased in 1972 for $350,000. At the time of the purchase Realty Mortgage had $250,000 in cash or cash equivalent assets and had net earnings in excess of $20,000 for the previous year. However, virtually the entire $250,000 had been used to pay the purchase price and Realty Mortgage had gone to a net loss position in excess of $20,000 in the interim period. Nevertheless, the transfer from G.S.C. to 1212 was at the same $350,000 price. This transaction resulted in 1212's books reflecting slightly less than the 15% maximum on inter-company investments.

While all this was going on, the investments in 1212 continued to be marketed to the public. Among the false statements made to investors were:

1) Investments were insured.

2) Investments were guaranteed.

3) There was no risk of loss.

4) The companies were experiencing marked growth and success.

These statements were contained directly or indirectly in advertisements and brochures, and communicated orally to various victim/investors.

The theft counts were for sales of trust indentures to individual investors; the securities fraud counts were for the false representations made to individual investors; the embezzlement counts concerned the "ranch transaction" involving attorney Cox; the false filing was with the Arizona Corporation Commission in 1974 (the corporate financial statement which included the sale of Realty Mortgage); and the conspiracy involved the overall operation.

Agnew was an owner of G.S.C. from 1972 forward. He was an officer and director and in charge of all the accounting. He directly supervised bookkeepers, approved all journal entries and received monthly reports of the company's financial condition. He was a member of the three-man loan committee for 1212. Generally, he exercised supervisory authority over all of the activities of the business.

The first documentary evidence of the intent to transfer Realty Mortgage Company from G.S.C. to 1212 was an exhibit in Agnew's handwriting. He was directly involved in the ranch transaction, signing the letter to the escrow company to disburse the funds. He and another officer met with Cox, thus getting the $100,000 back into 1212. He personally signed necessary documents to register and sell the securities and participated in the preparation of the false advertising. Our examination of the transcripts of the two month trial (22 trial days) leaves no doubt of his extensive involvement in the scheme whereby the investors were cheated.

G.S.C. was headquartered in Tucson and Agnew's activities were, for the most part, conducted in Tucson.

Appellant Beck was an employee of Pima Mortgage Co. (later Realty Mortgage Company) in Sierra Vista, Cochise County, Arizona. His principal job was mortgage placement, but he did sell some 1212 investments. He was made an officer of the Trust Corporation so he could be exempt from the requirement of separate registration as a dealer in securities. He was employed from June, 1972, to September, 1973, and from August, 1975, until early 1976. He made very few sales, had no control over any of the companies, and was not aware of the many financial transactions. There was evidence that he knew of the insolvent condition of 1212 and the Trust Corporation at least before the crime for which he was convicted. Illustrative of

Beck's minor involvement in 1212 is the amount of commissions he earned from the sale of these investments, $285.50 during his first period of employment, and $77.50 in 1975.

### AGNEW APPEAL

Appellant Agnew makes the following claims on appeal:

1) That he was denied substantial procedural rights in the presentation to the grand jury;

2) That the court erred in permitting the state to show that its witness, Cox, had pled guilty;

3) That it was error not to instruct the jury that intent to permanently deprive was an element of the crime of grand theft by false pretenses;

4) That the prosecutor made improper argument to the jury;

5) That the prosecutor improperly discussed the case with a newspaper reporter;

6) That evidence concerning a transaction with the Rocks (investors not named as victims) should not have been admitted;

7) That the court improperly instructed the jury that if they found the appellant guilty of conspiracy they "may also find that he is guilty of the other counts"; and

8) That the court erred in allowing the state to ask leading and unnecessary questions of the victims.

We affirm as to appellant Agnew. We will discuss the issues as presented.

### GRAND JURY

■ Although we find the appellant's claims concerning the grand jury hearing to be without merit, we cannot now consider them on appeal after his conviction. *State v. Verive*, 128 Ariz. 570, 627 P.2d 721 (App. 1981). He did file a special action seeking relief from the trial court's denial of his motion for a new finding of probable cause. That relief was denied. This issue is now moot.

### ADMISSION OF COX'S GUILTY PLEA

The state was permitted, over objection, to examine attorney Cox as follows:

"Q. Would you state your name for the record?

A. Thomas G. Cox.

Q. Mr. Cox, have you entered a plea of guilty to concealing a felony in the Superior Court in the State of Arizona?

A. Yes.

Q. Are you awaiting sentencing in connection with that plea?

A. Yes.

Q. And is one of the conditions of that plea that you would testify fully and completely in this matter?

A. Yes."

Counsel for both appellants had agreed not to show Cox's guilty plea in cross-examination so this was not the typical "drawing the sting." *See State v. Fleming*, 117 Ariz. 122, 571 P.2d 268 (1977).

■ Our supreme court has recently considered the admissibility of a codefendant's guilty plea in *State v. McDonald*, 117 Ariz. 159, 571 P.2d 656 (1977). That opinion acknowledges the overwhelming weight of authority that where two or more persons are charged with the same criminal offense and tried separately, the fact that one defendant has pled guilty is inadmissible against the other. The reason, of course, is that the jury might improperly consider this evidence of their defendant's guilt. The supreme court also recognizes certain exceptions—1) where it attacks a witness's credibility and 2) where it tends to impeach the witness's trial testimony, *United States v. King*, 505 F.2d 602 (5th Cir. 1974); *United States v. Del Purgatorio*, 411 F.2d 84 (2nd Cir. 1969). Neither exception is applicable here. The state concedes that the purpose of introducing the plea was not to attack the credibility of the witness. The plea was not introduced to impeach any trial testimony of the witness. Had the witness testified to some matter which could be impeached with the plea then it might have become admissible.

Both *McDonald, supra,* and *State v. Fendler,* 127 Ariz. 464, 622 P.2d 23 (App.1980), seem to limit the use of the guilty plea for impeachment to situations where the state is entitled to show the plea so the defendant cannot leave the impression that the state has something to hide. We do not believe the admissibility of a plea for purposes of impeachment should be so narrowly restricted, but, in any event, nothing in this case suggests that the appellants were going to attempt to leave any such impression concerning the witness.

The trial court allowed the evidence because it might tend to show the motive or bias of the witness and thus explain his testimony or demeanor. Although evidence of bias is generally admitted, and although the reason for its admission is its relevance in assessing credibility, that reason does not justify the admission of the guilty plea under the facts of this case. *See United States v. King, supra; See Also* Annot. 48 A.L.R.2d 1016; *State v. Corrales,* 131 Ariz. 471, 641 P.2d 1315 (1982).

■ The state argues that since the questions did not directly show that Cox's felony conviction was in or related to this case there was no prejudice. This argument insults the jury's intelligence. Cox was a named, although unindicted,[2] co-conspirator; the indictment alleged, and the evidence showed, that he was legal counsel for the enterprise. Surely the jury could properly conclude that his plea was to some charge in this case.

The state further argues that his plea was not related to Agnew. Since Agnew's involvement was so extensive it is inconceivable that the jury would not consider the plea to be Agnew-related—probably a plea to the conspiracy—which it was not—since he was named as a conspirator. This is also not the usual case where the indictment is read once by the clerk at the beginning of trial and forgotten. This jury had multiple copies of the amended indictment in the jury room during deliberations.

2. He was originally indicted but the amended

Although both appellants objected to the evidence of the plea, neither requested any cautionary instruction that it was not to be considered in any way as evidence of the guilt of the appellants. No such instruction was given. Since Cox did not testify directly that his plea was in this case, that may explain the lack of a requested instruction. Likewise, no instruction was requested or given concerning the limited use to be made of the felony conviction of a witness.

■ Thus we are faced with an issue in the same posture as faced the supreme court in *McDonald.* There the court held that where no cautionary instruction is requested or given, and where defense counsel has vigorously objected to the introduction of the plea, the facts and circumstances will be examined to decide whether the jury's verdict was possibly influenced, thereby prejudicing the appellants. In so doing we realize that—more so than with the ordinary witness—it can be argued by the appellant Agnew that Cox was legal counsel for the company and if he admitted his guilt then the jury might be more inclined to find his client guilty. In view of the overwhelming evidence of Agnew's guilt we reject that argument. McDonald was caught in the act of committing a burglary and the supreme court said his guilt was evident. Here Agnew had been caught in acts, which, although more complicated, nevertheless made his guilt just as evident. We conclude that the error in the admission of the guilty plea was harmless beyond a reasonable doubt. *See State v. McDonald, supra; Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## THEFT INSTRUCTION

■ The court gave the following instruction on the crime of theft by false pretenses:

"The crime of theft by false pretenses requires proof of the following things:

1. That the Defendant knowingly and intentionally made a false statement to another person; and

indictment removed him as a defendant.

2. That the statement concerned a past or present act [sic, fact], rather than an opinion or promise to be performed in the future; and

3. That the statement was made before the other person parted with his or her money in reliance on the statement; and

4. That the Defendant intended to defraud the other person."

The appellant requested that an additional element—the intent to permanently deprive the victim of his property—be included in the instruction. The court refused. We agree that the intent to permanently deprive was not a necessary element. *State v. Mills*, 96 Ariz. 377, 396 P.2d 5 (1964). We recognize that several appellate decisions since *Mills* include the intent to permanently deprive as an element of the crime. *See State v. Edgar*, 126 Ariz. 206, 613 P.2d 1262 (1980); *State v. Buelna*, 25 Ariz.App. 414, 544 P.2d 238 (1975); *State v. Joseph*, 20 Ariz.App. 70, 510 P.2d 69 (1973); *State ex rel. Hyder v. Superior Court*, 128 Ariz. 216, 624 P.2d 1264 (1981). In none of these cases was the instruction an issue on appeal, and there is no discussion of the necessity of this intent as an element of the crime. Some of these cases, for example *Joseph* which says the elements are well established law—cite grand theft cases not involving false pretenses. *See State v. Cravin*, 96 Ariz. 346, 395 P.2d 706 (1964); *State v. Marsin*, 82 Ariz. 1, 307 P.2d 607 (1957); *State v. Zaragosa*, 6 Ariz.App. 80, 430 P.2d 426 (1967); *State v. Batt*, 24 Ariz.App. 347, 538 P.2d 776 (1975). A recent opinion, *State v. Duffy*, 124 Ariz. 267, 603 P.2d 538 (App.1979), cites *Mills* for the very opposite of its holding. Another recent case interpreting former A.R.S. § 13–661 does not include the intent to permanently deprive. *State v. Ebner*, 126 Ariz. 355, 616 P.2d 30 (1980). In *Mills* the false representation was that the investor would get first mortgages on improved property. The mortgages delivered were inferior to senior mortgages and covered vacant lots. Mills argued that since he remained obligated and the victim had the right to sue on the note, there was no theft because there was no permanent depriva-

tion of property. The supreme court answered this argument:

"A creditor has a right to determine for himself whether he wishes to be a secured or an unsecured creditor. In the former case, he has a right to know about the security. If he extends credit in reliance upon security which is falsely represented to be adequate, he has been defrauded even if the debtor intends to repay the debt. His position is now that of an unsecured creditor; at the very least, an unreasonable risk of loss has been forced upon him by reason of the deceit. This risk which he did not intend to assume has been imposed upon him by the intentional act of the debtor, and such action constitutes an intent to defraud."

We find *Mills* to be the controlling authority which we should follow.

Although not raised by the parties, either in the trial court or on appeal, we note that the theft instruction given by the court was incomplete. The necessary element that the fraud was accomplished in that the victim gave his money to the defendant is omitted. A.R.S. § 13–661; *Maseeh v. State*, 46 Ariz. 94, 47 P.2d 423 (1935). Even though the instruction was clearly erroneous, we find the error harmless and not prejudicial. The uncontradicted evidence shows that each investor-victim named in a theft count of which the appellant was convicted did pay money for his investment and that it was received by the appellant's company. This element of the crime was never an issue. The appellant did not, and does not now, argue to the contrary. The contested issues were those other elements contained in the court's instruction—was there a false statement made knowingly and intentionally; did the statement concern fact or opinion; and was there an intent to defraud? The failure to instruct on a necessary element of an offense is not fundamental error where there is no issue as to that element. *State v. Evans*, 109 Ariz. 491, 512 P.2d 1225 (1973) (failure to sua sponte give instruction on specific intent, intent not an issue); *State v. Finley*, 108 Ariz. 420, 501 P.2d 4 (1972);

*State v. Reim*, 26 Ariz.App. 528, 549 P.2d 1046 (1976); *State v. Galbraith*, 114 Ariz. 174, 559 P.2d 1089 (App.1976). The error in this instruction could not have misled the jury under the facts of this case. The appellant's theft convictions cannot reasonably be supposed to be the result of the omission. 24B C.J.S. Criminal Law § 1922(1), p. 154 et seq.

## CLOSING ARGUMENT

 In closing argument Agnew's counsel argued that since the companies kept meticulous records they could not have intended criminal acts. In rebuttal the prosecutor argued:

> "Of course, the keeping of records is not itself, proof that somebody is a legitimate business man. Anybody who has lived in Tucson in the last four or five years has heard about Mr. Joe Bonano [sic] and the problems he has had."

The court immediately sustained an objection and that was the end of the matter. Appellant's mistrial motion was denied. We find no error. The court was probably correct in sustaining the objection, but the remark was not invective so palpably improper that it was clearly injurious. *See State v. Adams*, 1 Ariz.App. 153, 400 P.2d 360 (1965). The remark did not seek to connect the appellant with Bonnano, but only to rebut the bookkeeping argument. In a criminal prosecution counsel have great latitude in arguments to the jury. We will not second guess the trial judge on a mistrial motion for improper argument unless it is manifestly clear that the defendant has been denied a fair trial. *State v. Trotter*, 110 Ariz. 61, 514 P.2d 1249 (1973); *State v. Scott*, 24 Ariz.App. 203, 537 P.2d 40 (1975).

## NEWSPAPER REPORTER

 When the amended indictment was filed in open court, the prosecutor furnished a copy to a news reporter and explained the changes. This was neither unethical nor is it shown in any way to be prejudicial to the appellant. There is clearly no basis for reversal from this proper and permissible

conduct. *See* DR7–107(D), Rule 29(a), Rules of the Supreme Court, 17A A.R.S., saying counsel may quote from or refer without comment to public records of the court in a case.

## THE "ROCK" TRANSACTION

Donald and Dorothy Rock were investors who purchased trust shares from Roger Beck in 1972. No substantive charge was returned naming them as victims. They testified that Beck told them that their funds would ultimately be invested in FHA insured mortgages. Agnew claims that, since this false statement was dissimilar from the false statements made to others and since there was no charge involving the Rocks, this evidence was inadmissible as to Beck, therefore not admissible as to him, and prejudicial error resulted.

 The evidence was properly admitted against both appellants. It was not remote as to Beck since it occurred during the same time frame as transactions with two of the other victims Beck was charged with defrauding. The only count on which he was convicted was 2–3 years later. It was admissible against Beck as an exception to the rule against showing prior bad acts on all the Beck counts. It tended to show most of the exceptions enumerated in Arizona Rules of Evidence, Rule 404(b), 17A A.R.S., including motive, intent, plan, knowledge and absence of mistake. It matters little that the false representations were somewhat different from those Beck allegedly made to others—they concerned the same investments and their purported safety.

 The evidence was admissible on the conspiracy count against both appellants. It was an act during the period, alleged to be August, 1969, to January, 1976. It was conduct which would prove knowingly and designedly by means of false or fraudulent representations . . . defrauding people of money. It does not matter that it was not alleged as an overt act in the conspiracy count—all evidence in support of a conspiracy need not be alleged in that count or in the charging document.

## CONSPIRACY INSTRUCTION

■ At the end of the conspiracy instruction the court instructed:

"If you find the Defendant Agnew guilty of conspiracy, you may also find that he is guilty of other counts charged in the Indictment in which he is named as a Defendant if you find:

1. That the crime charged in another count of the Indictment was proven beyond a reasonable doubt; and

2. That the crime was committed pursuant to the conspiracy by the Defendant or a conspirator; and

3. That the Defendant AGNEW was a member of the conspiracy at the time the crime was committed."

Appellant claims this instruction was "unwarranted, tended to emphasize that the jury must look beyond the conspiracy count and was a comment on the evidence." Since no authority or rationale is given for these conclusions, we have difficulty considering them.. The instruction clarifies the "agency" concept of a criminal conspiracy. In no way does it comment on any evidence. It assumes no facts—it expresses no opinion on what the evidence is or is not. *See State v. Vann*, 11 Ariz.App. 180, 463 P.2d 75 (1970).

## LEADING QUESTIONS

■ The questions to which the appellant objected were those asked of the investor-victims to show their reliance on the false representations. For example, "Had you known the trust was not insured would you have invested?" or, "Had you known you were going to be paid principal rather than interest ...?" or "Had you known the trust was insolvent ...?" These are not leading questions. A leading question is one that suggests the answer, such as, the cat was black, wasn't it? A question is not leading just because the answer is obvious. An evidentiary matter of this nature is left to the discretion of the trial judge. Besides, the appellant has shown no prejudice. It is unbelievable that this testimony was adduced only because the questions were leading, if they were. *See State*

*v. Duffy, supra,* for a discussion permitting the use of leading questions in complex land and securities fraud cases.

## BECK APPEAL

Appellant Beck presents six issues on appeal. Two were raised by appellant Agnew—the Cox plea and the Rock testimony. The other issues are:

1) Alleged misjoinder of his trial with Agnew;

2) The court's refusal to grant a bill of particulars;

3) Speedy trial; and

4) Improper venue.

## VENUE

■ The dispositive issue in Beck's appeal is raised by his claim concerning venue. We find that the evidence failed to establish venue in Pima County for the trial of the single offense of which Beck was convicted. Since proper venue is a jurisdictional requirement in Arizona, *State v. Cox*, 25 Ariz.App. 328, 543 P.2d 449 (1975), we must reverse.

Article 2 § 24 of the Arizona Constitution provides:

"In criminal prosecutions, the accused shall have the right ... to have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed, ...."

We agree with the parties that the venue statutes applicable to Beck's prosecution were those in effect at the time of the offense.

A.R.S. § 13–1503 provided:

"In all criminal prosecutions the trial shall be in the county *where the offense was committed or consummated* unless otherwise provided by law." (emphasis added) and,

A.R.S. § 13–1504(B) provided:

"Where several acts are requisite to the commission of an offense, the trial may be in any county in which any of such acts occurs."

In *State v. Cox, supra,* this court held that the words "requisite to the commission of an offense," as used in the latter statute, referred to an act constituting an essential element of the offense.

Arguing against this background, the state has propounded a fairly complex argument in support of Pima County venue. A.R.S. § 44–1991, the statute under which Beck was charged in the relevant count of the indictment (Count 28), makes it unlawful to make a material misrepresentation "in connection with a transaction . . . involving an offer to sell or buy securities, or a sale or purchase of securities. . . ." Count 28 omitted any mention of an *offer* and charged that the misrepresentation had been made in connection with a *sale* of securities. The state argues that this narrowly drawn indictment made an actual completed sale an essential element of the charged offense. Also, although not specifically argued by the state, the crime would have been "consummated" in Pima County under A.R.S. § 13–1503. Since money received from Albert and Mitzi Rogers was transferred to Pima County,[3] and since the documents being sold were "processed" in Pima County, the state contends that the sale took place, at least in part, in Pima County, even though the documents were paid for and delivered in Cochise County. We need not address the correctness of the state's designation of Pima County as the situs of the sale (or the consummation of the crime), since even our adoption of the state's theory, in its entirety, would require us to reverse.

First, although we believe the state to be technically correct in stating that a completed sale was essential to the commission of the offense as charged, we find that the instructions did not inform the jury that it could reach a verdict of guilty only upon finding that a sale had taken place. It was only instructed:

"In connection with a transaction involving the purchase or sale of a security, the crime of securities fraud requires proof of one or more of the following:

1. That the defendant engaged in any transaction, practice or course of business which the defendant knew operated or would operate as a fraud or deceit;

Or

2. That the defendant knowingly made an untrue statement of material fact."

Without benefit of the full text of A.R.S. § 44–1991 for comparison, and viewing this instruction with the common sense of laymen, the jury could easily have concluded that a representation relating to an offer to sell was one made "in connection with" a sale, regardless of whether the sale was completed.

There is, however, a more basic flaw in the state's argument. Accepting the state's conclusions that a completed sale was an essential element of the charged offense and that the sale took place in Pima County, we would still find that venue did not lie in Pima County. The discussion of venue in this court's opinion in *Cox, supra,* pointed out that not every element of an offense has significance in fixing venue. There the state had argued that the defendant had possessed the requisite intent in Pima County. Even though that intent was an essential element of the charged offense (attempted second-degree murder) it was held that the formation and possession of that intent was not sufficient to vest jurisdiction in Pima County. This case calls for a more thorough exposition of the principle underlying that holding.

In rejecting the state's argument in *Cox,* this court distinguished between "act" and

---

3. The state has made no effort to defend Pima County venue by reason of this transfer of money, even though former A.R.S. § 13–1510 provided:

 "When a person obtains property by theft, burglary, robbery, false pretenses or embezzlement in one county and brings the property so obtained into any other county or county, he may be tried in the county in which he obtains the property or in any other county into which he brings it."

 The state has conceded that this statute, unlike its current counterpart, A.R.S. § 13–109(B)(6), could establish venue only in a prosecution for one or more of the specifically enumerated offenses.

"intent," the union of which was the minimal requisite to criminal liability under our former criminal code.[4] "Act" and "intent" are common labels for *two* of what are traditionally regarded as the *four* different kinds of "elements" of a criminal offense. A complete listing of the four varieties of elements would read as follows:

1) An act (or omission)—traditionally designated "actus reus," now called "conduct" in our criminal code;

2) "Intent"—traditionally called "mens rea," now called "culpable mental state";

3) Circumstances—e.g., the lack of spousal relationship between victim and offender in sexual assault, or ownership of property by "another" in a theft;

4) Result—e.g., death of the victim in a homicide, or damage to property in reckless burning (A.R.S. § 13–1702).

These four different varieties of criminal elements combine in various ways to constitute crimes. Under our former criminal code, the first two—act and intent (or criminal negligence)—were requisite elements of every offense, although many offenses also included elements of the other two varieties. The current code requires only "conduct" as an absolute requisite to criminal liability, but continues to define the majority of offenses to include elements consisting of culpable mental state, circumstances, or result.

▇▇▇ The pertinent statute in this case, former A.R.S. § 13–1504(B), fixes venue in any county where an *act* requisite to the commission of the offense was committed. The word "act," as used in this statute, should be read to mean what it says. It refers only to criminal elements of the first listed variety—the "actus reus" of the offense, i.e., the actual conduct of the accused or his agent that gives rise to criminal liability when committed with the required culpable mental state, under the required circumstances, and leads to any required result.

▇▇▇ The offense of which Beck was convicted is defined in the following words by A.R.S. § 44–1991:

"It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities; ... to ... make any untrue statement of material fact."

Under this statute, neither an offer to sell or buy nor an actual sale or purchase of securities is an *act* requisite to the commission of the offense. The only act necessary to a violation of this statute is the making of an untrue statement of material fact. Although there must also be an offer or purchase or sale, that element of the offense must be classified as a "circumstance" that must exist in connection with the statement, but which need not be, or even result from, an act of the accused. We therefore conclude that the sale of securities in this case, even if it was a required element of the offense as charged, was not an "act" requisite to the commission of that offense. Venue therefore did not lie in Pima County even if the sale took place in Pima County.

Although not argued by the state to justify Pima County venue, since we should affirm if venue was proper for reasons other than those urged, we have also considered A.R.S. § 13–1505:

"Where a person in one county aids, abets or procures the commission of an offense in another county he may be tried for the offense in either county."

Our analysis requires that we reject that statute, since any conduct of Beck that constituted aiding and abetting was in the same county where the offense was committed, Cochise County.

The state has conceded that even though there was proper venue for the conspiracy count, that does not create venue for Count 28. We have found no authority holding that where venue is established for co-defendants or for counts that are otherwise

---

4. *Compare* current A.R.S. § 13–201.

properly joined, venue is "boot strapped" for a crime that otherwise must be charged in another jurisdiction.

We turn now to the other issues presented by Beck. Since the issue of improper joinder will not arise in any retrial we will not discuss it. We have already addressed the issues of the *Cox* plea and the Rock testimony. In view of our holding on the *Cox* plea, it would not be admissible on retrial, given the same avowal by defense counsel. We leave the admissibility of the "Rock evidence" to the discretion of the trial judge if the case is retried.

## BILL OF PARTICULARS

█ The trial court denied appellant Beck's motions for a bill of particulars. As this court noted in *State v. Bruni*, 129 Ariz. 312, 630 P.2d 1044 (App.1981), our present Rules of Criminal Procedure, 17 A.R.S., do not provide for a bill of particulars. Even if they did, the first motion sought particulars concerning only the conspiracy count which the court dismissed, so this issue is moot. The second motion, which renewed the first motion and sought particulars concerning the other counts, was made on the date set for trial and was not timely. Rule 16.1(b), Rules of Criminal Procedure, 17 A.R.S.

## SPEEDY TRIAL

█ We must address this issue because if there was a violation of appellant Beck's speedy trial right, the charges against him should have been dismissed.

Appellant's attack is two-pronged: first, that his federal constitutional right was violated and second, that there was a Rule 8 violation because no certain trial date was set as provided in Rule 8.1(e), Rules of Criminal Procedure, 17 A.R.S. We find no merit in either argument.

We will consider the alleged Rule 8 violation first, then the federal constitutional argument.

Appellant was indicted by the state grand jury in November, 1978. The mistrial was in May, 1980. Shortly after the indictment was returned, the state filed an application for suspension of Rule 8 pursuant to Rule 8.1(e) which provides:

"Extraordinary Cases. Within five days after the arraignment in Superior Court either party may apply in writing to the court for a hearing to establish extraordinary circumstances requiring the suspension of Rule 8 in a particular case. Within five days of the receipt of the application the court shall hold the hearing and make findings of fact. The findings shall be immediately transmitted to the Chief Justice who may approve or decline to approve them. Upon approval of the findings by the Chief Justice, they shall be returned to the trial court where upon motion of either party the trial court may suspend the provisions of Rule 8 and reset the trial date for a time certain."

On December 4, 1978, the trial court made the following findings:

"1. That none of the Defendants are in custody,

2. That the case involves seventy-three (73) counts against eight (8) different Defendants,

3. That the counts involve charges of conspiracy against all Defendants and violations of the Security Act as to individual Defendants,

4. That the documentary evidence involved in this case will be voluminous,

5. That a search for Brady materials will entail examination of some fifteen (15) filing cabinets of documents and fifty three (53) boxes of additional records,

6. That some twelve (12) to fifteen (15) of the alleged victims and witnesses reside outside of Pima County, one of whom is presently in Germany,

7. That the case in its present posture will probably take two (2) months to try,

8. That there will be several hundred exhibits,

9. That the number of persons who may possibly be witnesses is seventy five (75),

10. That because of the volume of materials involved, disclosures will be

lengthy and, unless the Court suspends the local Rules requiring the furnishing of copies of materials to opposing counsel, the furnishing of such materials will be time consuming.

Based upon the foregoing,

THE COURT FINDS that this case is an extraordinary case within the meaning of Rule 8(e) of the Rules of Criminal Procedure."

These findings were transmitted to the Chief Justice, who approved them, and Rule 8 was suspended; however, that trial court did not, at that time, reset the trial date for a time certain.

The court did not ignore that requirement of Rule 8.1(e). When the provisions of Rule 8 were suspended on January 8, 1979, the court said that a date certain for the trial was to be set at the time of the omnibus hearing. In the same minute entry order, the court further said that a time certain for the omnibus hearing would be set later. It appears that before that could be accomplished the court was deluged with a bevy of defense motions. At least one motion or response was filed almost every day for two to three months and frequently thereafter until August 31, 1979, when appellant Beck filed his motion to dismiss on speedy trial grounds, in which he also raised the objection that no certain trial date had been set. This is not to say that Beck had not made his position clear before that—he had—and he had not joined in the vast array of motions filed by his co-defendants.

During the period from January through August, the trial court had hearings on the various motions on the average of two to three each month. It appears that all of the motions were of such a nature (for example, to remand for new finding of probable cause) that an omnibus hearing would have been premature.

On November 8, 1979, the trial court set separate omnibus hearings for each defendant during the period of November 20 to 23. Beck's was scheduled on November 20. The record is silent as to whether this hearing was ever conducted. On December 6, however, the court set the trial date for March 3, 1980. On February 8, the court granted other defendants' motions to continue over Beck's objection. The new date set for trial was May 5. (Since Rule 8 was suspended the continuance could properly be for more than 30 days.)

The trial did not actually commence until May 28, but the record shows hearings almost every court day from May 5 to May 28.

The failure to set a trial date at the time Rule 8 was suspended was, at most, only technical error. If, at that time, the court had set a date in May, as the state requested, continuances would have been necessary. Our review of the record satisfies us that the trial judge patiently heard and disposed of the many questions presented as expeditiously as humanly possible and that trial was commenced at the earliest opportunity. This technical error was in no way prejudicial to the appellant and is not grounds for reversal.

■ Turning now to the appellant's argument that the delay denied his right to a speedy trial pursuant to the 6th Amendment to the U. S. Constitution, four factors are to be considered:

1) The length of the delay,

2) The reasons for the delay,

3) The appellant's assertion of the right, and

4) Prejudice.

*Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *State v. Soto*, 117 Ariz. 345, 572 P.2d 1183 (1977).

■ The length of the delay, November, 1978 to May, 1980 (or November for the second trial), is such that it requires us to examine the other factors.

The reasons for the delay are apparent. In retrospect they are contained in the trial court's findings for suspension of Rule 8. The subsequent record demonstrates they were understated.

We find that the appellant has asserted his constitutional right continuously throughout the proceeding.

Has the appellant been prejudiced? We think not. The only prejudice urged is that the witnesses were asked to testify to matters occurring five or more years in the past. This observation could be made in any case wherein a witness is asked to recall events occurring more than five years before his testimony. The appellant's only specific complaint concerning a witness's memory has to do with victim Rogers. He was the principal witness against the appellant on the count for which he was convicted. The only "faulty memory" of that witness demonstrated by the record, however, has to do with a discrepancy between his trial testimony and a statement he had given earlier to an investigator having to do with whether the appellant told him the investment was insured up to $40,000. The apparent inconsistency between the prior statement and the trial testimony was thoroughly presented by the cross-examination. The record shows the "impeachment" of the witness by his prior inconsistent statement. We are not persuaded that the appellant was prejudiced by this exchange. We have reviewed all of Mr. Rogers' testimony. At no point does it appear that he suffered from a memory problem due to the passage of time. His direct and cross-examination covers thirty-four pages of transcript. The only questions to which he indicated that he did not remember are:

"Q. And when did you first hear of the company?

A. I don't remember exactly. Most probably October, 1975.

. . . . .

Q. It indicates, doesn't it, that you have received a copy of an offering circular?

A. Yes.

Q. Did you receive an offering circular at that time, on October 10th?

A. I don't remember.

Q. Do you know what an offering circular is?

A. I don't remember.

Q. We will come back to that.

. . . . .

Q. Was this organized the way it is now when you got it, with the Amended Declaration in front of the first page of the offering circular, or was the Amended Declaration behind it?

A. I don't remember.

Q. Did you look at this page before; that is to say, back in 1975?

. . . . .

A. I might have looked at it, yes.

Q. You did at that time, too?

A. I don't remember, I'm sorry."

This hardly demonstrates a memory problem. The remainder of Rogers' answers are concise and positive. We find no prejudice to the appellant from the delay, particularly since the thrust of the Rogers fraud was oral misrepresentations. Our consideration of the four factors causes us to find no violation of the appellant's 6th Amendment right.

We are aware that the appellant also contends that the denial of his several motions to sever his trial—an issue raised on appeal which we have found unnecessary to address—is the real cause of his trial delay. In other words, if his trial had been severed, he could have been tried separately long before May, 1980. The same argument could be made concerning the denial of his venue motion. Since Rule 8 was properly suspended, and since no prejudice has been shown, the trial court did not err in denying his motion to dismiss.

Agnew's convictions are affirmed. We reverse Beck's conviction.

HOWARD, C. J., and HATHAWAY, J., concur.