917 P.2d 1214

**STATE of Arizona, Appellee,**

v.

**James Erin McKINNEY, Appellant.**

**STATE of Arizona, Appellee,**

v.

**Charles Michael HEDLUND, Appellant.**

Nos. CR–93–0362–AP, CR–93–0377–AP.

Supreme Court of Arizona,
En Banc.

May 16, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Mona S. Peugh–Baskin, Phoenix, for State of Arizona.

Neal W. Bassett, Phoenix, for James Erin McKinney.

Karen Kemper, Phoenix, for Charles Michael Hedlund.

## OPINION

FELDMAN, Chief Justice.

This consolidated appeal is the first for these defendants following their convictions for two murders, committed two weeks apart, during the commission of residential burglaries. The trials were held simultaneously using dual juries, which this court approved in advance.[1] On November 12, 1992, McKinney's jury found him guilty of first degree murder for the deaths of Christene Mertens and Jim McClain. That same day, Hedlund's jury found him guilty of second degree murder for Mertens' death and guilty of first degree murder for McClain's death. The court sentenced McKinney to death on both of his first degree murder convictions and sentenced Hedlund to death for his first degree murder conviction. Appeal of each judgment and sentence is automatic. Ariz. R.Crim.P. 26.15 and 31.2(b). This court has jurisdiction under Ariz. Const. art. VI, § 5(3) and A.R.S. §§ 13–4031 and 13–4033(A).

## BACKGROUND

Beginning February 28, 1991, James Erin McKinney and Charles Michael Hedlund (Defendants) commenced a residential burglary spree for the purpose of obtaining cash or property. In the course of their extensive planning for these crimes, McKinney boasted that he would kill anyone who happened to be home during a burglary and Hedlund stated that anyone he found would be beaten in the head.

Defendants enlisted two friends to provide information on good burglary targets and to help with the burglaries. These two friends, Joe Lemon and Chris Morris, were not physically involved in the burglaries in which the murders occurred. It was from Lemon and Morris, however, that Defendants learned that Christene Mertens would make a good burglary target.

The first burglary in the spree occurred on February 28, 1991. Mertens' home was the intended target that night, but she came home and scared the would-be burglars away. A different residence was chosen to burglarize, but Defendants obtained nothing of value. Both Defendants, as well as Lemon and Morris, were involved in this crime.

The second and third burglaries occurred the next night, March 1. This time Lemon was not involved. The three participants stole a .22 revolver, $12, some wheat pennies, a tool belt, and a Rolex watch.

1. *Hedlund v. Sheldon,* 173 Ariz. 143, 840 P.2d 1008 (1992).

## A. The first murder

The fourth burglary took place on March 9, 1991. This time only McKinney and Hedlund were involved. Mertens was picked again because Defendants had been told by Lemon and Morris, who knew Mertens' son, that Mertens kept several thousand dollars in an orange juice container in her refrigerator.

Mertens was home alone when Defendants entered the residence and attacked her. Beaten and savagely stabbed, Mertens struggled to save her own life. Ultimately, McKinney held her face down on the floor and shot her in the back of the head, covering his pistol with a pillow to muffle the shot. Defendants then ransacked the house and ultimately stole $120 in cash.

## B. The second murder

Defendants committed the fifth burglary on March 22, 1991. The target was Jim McClain, a sixty-five-year-old retiree who restored cars for a hobby. McClain was targeted because Hedlund had bought a car from him some months earlier and thought McClain had money at his house. Entry was gained through an open window late at night while McClain was sleeping. Hedlund brought along his .22 rifle, which he had sawed-off to facilitate concealment. Defendants ransacked the front part of the house then moved to the bedroom. While he was sleeping, McClain was shot in the back of the head with Hedlund's rifle. Defendants then ransacked the bedroom, taking a pocket watch and three hand guns; they also stole McClain's car.

## State v. Hedlund
## TRIAL ISSUES

### A. Was Hedlund denied his right to counsel?

██ Hedlund claims that a hearing conducted in the absence of one of his attorneys was structural error requiring automatic re-

versal and violated his Sixth Amendment right to counsel because the hearing was a critical stage of the proceedings.

At trial, Lemon was called as one of the state's witnesses. After Lemon provided some preliminary testimony, a brief recess was called and a hearing conducted out of the jury's presence to determine if Lemon could be impeached with his juvenile record. One of Hedlund's lawyers, Mr. Leander, stepped out of the courtroom because he was not feeling well. While still on the record, the judge allowed Mr. Allen, McKinney's counsel, to question Lemon under Ariz.R.Evid. 609.[2]

Lemon had previously been interviewed by all attorneys involved, and no evidence of any juvenile adjudications ever surfaced. The prosecutor told Defendants' attorneys that Lemon had no juvenile convictions, but neither counsel was satisfied and wanted to question him again.

While Mr. Leander was out of the courtroom, Lemon testified to having once been formally charged as a juvenile for aggravated battery. Lemon testified that he had gone before a judge on this charge, but that he never had a hearing where witnesses were called, never pleaded guilty, and had not been adjudicated. Lemon also testified that he was placed under house arrest for two weeks. Although Lemon's encounter with the juvenile justice system is not well explained in the record, it appears that Lemon was present, but not involved, when another juvenile was beaten by some other person, and that the juvenile judge ordered Lemon to serve some in-home detention and required him to get a job or go back to school. At the conclusion of Mr. Allen's examination and the state's cross-examination of Lemon, no evidence of any adjudication had been presented. Thus, the judge ruled that Lemon could not be impeached with his juvenile record.

When the trial resumed a few minutes later, Mr. Leander had returned and object-

---

**2.** Ariz.R.Evid. 609(d) provides that:
Evidence of juvenile adjudication is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of juvenile adjudication of a witness other than

the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.

ed to the hearing having taken place without him. The judge refused to re-open the hearing unless Mr. Leander was prepared to introduce substantive evidence of juvenile adjudications. Mr. Leander had no such evidence and stated that he would like to question Lemon. The judge refused to allow any more questioning, concluding that Messrs. Leander and Allen had an identity of interest, that Mr. Allen had adequately explored the issue, and that in doing so had discovered no evidence of a juvenile adjudication.

Whether counsel's absence during a hearing violates the Sixth Amendment depends on whether the absence created a structural defect. *See Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). This determination may turn on whether the hearing was a critical stage of the adversary proceedings. *See United States v. Cronic*, 466 U.S. 648, 658–59, 104 S.Ct. 2039, 2046–47, 80 L.Ed.2d 657 (1984); *United States v. Olano*, 62 F.3d 1180, 1193 (9th Cir.1995); *United States v. Benlian*, 63 F.3d 824, 827 (9th Cir.1995).

### 1. What is a structural defect?

A "structural defect" is an error that affects "the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Fulminante*, 499 U.S. at 309–10, 111 S.Ct. at 1264–65. In general, *per se* structural defects affect "[t]he *entire* conduct of the trial from beginning to end...." *Id.* at 310, 111 S.Ct. at 1265 (emphasis added). Such defects include total deprivation of counsel, a judge who is not impartial, unlawful exclusion of jurors who are of the defendant's race from a grand jury, denial of the right to self-representation, and denial of the right to a public trial. *Id.*

Hedlund does not claim, and the record does not show, that he suffered anything approaching a total absence of counsel. Accordingly, there is no *per se* structural defect.

Therefore, Hedlund is entitled to *Cronic*'s presumption of prejudice only if the Rule 609 hearing was a critical stage of the trial. *See Benlian*, 63 F.3d at 827.

### 2. What is a critical stage of the trial?

A "critical stage" is one at which "substantial rights of the accused may be affected." *State v. Conner*, 163 Ariz. 97, 104, 786 P.2d 948, 955 (1990); *Menefield v. Borg*, 881 F.2d 696, 698 (9th Cir.1989) (quoting *Mempa v. Rhay*, 389 U.S. 128, 134, 88 S.Ct. 254, 257, 19 L.Ed.2d 336 (1967)) ("[C]ounsel ... is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected.") (sentencing). Whether a particular proceeding is a critical stage may depend on state law as well as the facts of the case. *See Chester v. California*, 355 F.2d 778, 779 (9th Cir.1966) ("An accused has a constitutional right to [counsel] at a preliminary examination in a state court if, under facts of the particular case, the examination is a [critical stage]."). The test for a critical stage is based on the following factors:

> First, if failure to pursue strategies or remedies results in a loss of significant rights.... Second, where skilled counsel would be useful in helping the accused understand the legal confrontation.... Third, ... if the proceeding tests the merits of the accused's case.

*Menefield*, 881 F.2d at 698–99 (citations omitted). Hedlund offers no authority, and research reveals none, to support his contention that a Rule 609 hearing is necessarily a critical stage of the trial under Arizona law.[3] Thus, under the facts of this case, we conclude that the Rule 609 hearing was not a critical stage of Hedlund's proceedings.

### B. Denial of confrontation

 Hedlund also claims that the refusal to let his attorney question Lemon at the

---

**3.** *Cf. Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (taking of handwriting exemplars *not* critical stage); *United States v. Benlian*, 63 F.3d 824 (9th Cir.1995) (presentence interview is *not* a critical stage); *United States v. Olano*, 62 F.3d 1180 (9th Cir. 1995) (minor matters discussed by the court in

the absence of defendant's counsel are *not* a critical phase of the trial); *United States v. LaPierre*, 998 F.2d 1460 (9th Cir.1993) (post-charge line-up *is* critical stage); *United States v. Birtle*, 792 F.2d 846, 848 (9th Cir.1986) (oral argument and filing of reply brief *not* critical stages).

**574**

hearing was a denial of the right to confrontation and that such denial prevented impeaching Lemon with his juvenile record. Hedlund argues that his right to confrontation is paramount to the state's interest in protecting Lemon as a juvenile offender-witness. *See Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *State v. McDaniel*, 127 Ariz. 13, 617 P.2d 1129 (1980). In the abstract we agree with Hedlund's proposition, but we find his argument inapplicable to the facts of his case because Hedlund and his lawyer were present when Lemon testified and the lawyer was permitted to and did examine Lemon.

Hedlund's complaint here is confined to the lawyer's absence at a hearing much like a motion in limine. Hedlund, however, has never proffered any evidence to show that Lemon had *any* juvenile adjudication, let alone one with which he could have been impeached. Indeed, as late as oral arguments in this court, Hedlund's counsel possessed no evidence that Lemon had ever been adjudicated as a juvenile. Furthermore, Lemon was not an accomplice in the crimes, was never charged, and was never offered immunity for his testimony. He was eighteen years old at trial and therefore could not have been on juvenile probation at the time of the trial. *See* Ariz. Const. art. VI, § 15. In sum, Hedlund fails to demonstrate how Lemon's juvenile record could have been used for anything other than a general attack on his character. *See State v. Morales*, 120 Ariz. 517, 520–21, 587 P.2d 236, 239–40 (1978); *cf. McDaniel*, 127 Ariz. at 15–16, 617 P.2d at 1131–32. We refuse to speculate whether Hedlund's lawyer would have discovered something at the Rule 609 hearing that McKinney's lawyer could not and did not and that neither lawyer has discovered to this day.

## C. Right to enter a change of plea

On September 18, 1992, Hedlund's attorney and the prosecutor had an informal conference in the judge's chambers regarding a plea agreement that had been reached between Hedlund and the prosecutor. Because this meeting was off-the-record, there is no contemporaneous documentation of what took place. There is also no record of the substance of the proffered plea agreement. Both parties agree, however, that the judge indicated he would not accept the plea because it lacked accountability for Hedlund with respect to the McClain homicide.

Following the informal conference, the court convened on the record and put counsel on notice that it was setting a firm trial date of October 13, 1992. After this, there is nothing in the record regarding the status of plea negotiations until October 13. In the interim, Hedlund filed a motion to require the trial judge to recuse himself so that he could enter a plea in front of another judge. Hedlund's proffered reason for seeking the recusal was the appearance of impropriety arising from the judge having read letters from a victim's family expressing their feelings about the plea rejected by the judge on September 18.

A hearing on the recusal motion was held, at which Hedlund attempted to "memorialize" the substance of the September 18 informal meeting. In actuality, the recusal hearing consisted primarily of hearsay and recollection about what happened at that meeting, what was said during telephone calls placed in the interim, and what was supposedly contained in the latest plea agreement.

The crux of Hedlund's complaint on this point is a claim that the trial judge refused to make himself available on Friday, October 9 to review the latest plea agreement. Hedlund contends that because of this refusal, he was unable enter a plea and avoid the death penalty. The trial judge testified at the recusal hearing that pursuant to a telephonic agreement earlier in the week, the attorneys were to be in his office on Thursday, October 8, but were not.

There is nothing in the record showing a plea agreement was reached between Hedlund and the prosecutor after the September 18 plea was rejected. The prosecutor testified that Hedlund rejected his subsequent offer on October 6, that there was never an offer outstanding after October 7, and because no further agreement was reached, there was never a reason to go to the judge. Because this record does not indicate that a

second plea agreement was ever reached and submitted, we reject the claim that the trial judge declined to further entertain a plea.

 It is well settled that criminal defendants have no constitutional right to a plea agreement and the state is not required to offer one. *See State v. Draper,* 162 Ariz 433, 440, 784 P.2d 259, 266 (1989); *State v. Morse,* 127 Ariz. 25, 31–32, 617 P.2d 1141, 1147–48 (1980). Furthermore, a plea bargain can be revoked by any party, at any time, prior to its acceptance by the court. *Id.;* Ariz.R.Crim.P. 17.4(b) and (d). With no right to a plea bargain and the ability of the prosecution to discontinue negotiations at will or withdraw a plea offer prior to court acceptance, we also cannot conclude that the trial judge abused his discretion by refusing to schedule a hearing to review a plea agreement that does not appear to have existed.

## D. Use of leading questions

 Hedlund complains of two specific instances in which he claims the prosecutor was improperly allowed to ask leading questions. Hedlund contends the court allowed leading questions on direct examination, thereby violating his rights under the Sixth and Fourteenth Amendments to the United States Constitution. The specific complaints stem from the following testimony at trial:

Q. [PROSECUTOR] Did you see anything else in the trunk?

A. [LEMON] No, not that I can recall.

Q. Did you see at any time Mike Hedlund's .22 rifle?

MR. LEANDER: Your Honor, again, leading. He said he didn't see anything in the trunk.

THE COURT: The objection is overruled. You can answer.

THE WITNESS: At any time?

Q. That evening when you looked into the trunk.

A. No, I don't recall.

. . . . .

Q. [PROSECUTOR] When you were around Michael Hedlund after Christene Mertens was killed, did Michael Hedlund

appear to be slightly more aggressive towards you or Chris [Morris]?

MR. LEANDER: Objection your Honor, leading. Prosecutor can ask how he acted.

THE COURT: The objection is overruled. You can answer.

THE WITNESS: No, not that I can recall. He acted like, like he wasn't nice, as nice to us anymore, like, but he wasn't aggressive.

Hedlund has not demonstrated that the questions he complains of are leading. Leading question are those "suggesting the desired answers." *See* MODEL CODE OF EVIDENCE, Rule 105 (A.L.I.1942); MORRIS K. UDALL ET AL., ARIZONA EVIDENCE § 33 (3d ed. 1991). An example of such a question would be "The cat was black, wasn't it?" *State v. Agnew,* 132 Ariz. 567, 577, 647 P.2d 1165, 1175 (App.1982).

This court has stated that the "general rule is that questions that put the *answer* into the mouth of one's witness in chief should not be asked." *Ball v. State,* 43 Ariz. 556, 558, 33 P.2d 601, 602 (1934) (emphasis added). As UDALL notes, "[w]hat is desired is that the trier hear what the witness perceived, not the acquiescence of the witness in counsel's interpretation of what he perceived." UDALL, *supra* § 33, at 55.

Obviously, from the questions asked of Lemon, counsel sought to elicit "yes" or "no" answers. However, a "question is not leading just because the answer is obvious." *Agnew,* 132 Ariz. at 577, 647 P.2d at 1175. Counsel did not suggest what the answers should be; therefore, the questions were not leading. Furthermore, even if the questions were leading, Lemon's answers were favorable to Hedlund, as he testified that he did *not* see the rifle and that Hedlund was *not* aggressive. Any error was therefore harmless beyond a reasonable doubt.

## E. The jury's view of Hedlund in leg shackles

 Hedlund was required to wear leg shackles during the trial. The layout of the courtroom resulted in the defense table being directly across from the jury box and there was no covering on the front of the table to

hide Hedlund's legs from the jury. Hedlund argues that his constitutional rights were violated because the jury was facing the defense table and necessarily saw the shackles.

In *State v. Boag*, this court commented on the obvious need to leave matters of courtroom security to the discretion of the judge, stating that "absent incontrovertible evidence of [harm to the defendant], the trial court should be permitted to use such means, to secure the named ends [as circumstances require]." 104 Ariz. 362, 366, 453 P.2d 508, 512 (1969). The only evidence of harm Hedlund offers is a third-party, hearsay statement from a defense investigator alleging one juror said she made eye contact with one of the defendants and that it was "eerie." Such an unsubstantiated allegation falls far short of the evidence contemplated in *Boag*.

■ When a trial judge's decision to restrain a defendant is supported by the record, this court has upheld that decision, even when the jury views the defendant in restraints. *State v. Harding*, 137 Ariz. 278, 288–89, 670 P.2d 383, 393–94 (1983) (*pro se* defendant wore shackles), *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984); *State v. Stewart*, 139 Ariz. 50, 53–57, 676 P.2d 1108, 1111–12 (1984) (defendant wore leg brace, visible shackles, and was gagged); *State v. Johnson*, 122 Ariz. 260, 272, 594 P.2d 514, 526 (1979) (defendant wore leg irons and was heavily guarded). Here, the trial judge specifically made a record to document his security concerns: Hedlund attempted an escape during the summer of 1991 and also made plans with another capital defendant to escape by attacking a guard and taking his uniform and gun. Given the judge's well-founded security concerns and the absence of evidence of specific prejudice to Hedlund, we cannot find that the judge abused his discretion.

## F. The consensual search

Two uniformed officers from the Mesa Police Department and Detectives Click and Kelly of the Chandler Police Department approached Hedlund at his home. Detective Kelly told Hedlund there was an investigation regarding James McKinney and asked if he would go with them to the police depart-

ment. Hedlund agreed. Detective Click then asked Hedlund if he would consent to a search of his bedroom. Hedlund consented, and he and the officers went to the bedroom.

While Detectives Click and Kelly remained in the bedroom, Hedlund stepped out of the room to get his shoes. During Hedlund's absence, Detective Click opened a dresser drawer and found various items, including two pocket watches, one silver or chrome and the other gold-colored. Thinking the watches looked out of place, Detective Click removed them from the drawer and placed them on top of the dresser.

When Hedlund returned to the room, he was asked about the watches. Hedlund stated one was stolen by his sister from an ex-boyfriend and that he had owned the other for some time. Detective Click *asked* Hedlund if he would take the watches with him to the police station. Hedlund agreed and put the watches in his pocket. Click testified that if Hedlund had not agreed to take the watches, they would have been left at the house.

Once at the Chandler jail, Hedlund's property, including the watches, was taken from him and placed in an interview property bag for safekeeping. Hedlund was then placed in a holding cell. About an hour later Hedlund was taken to an interview room where he was read his *Miranda* rights and interviewed by two officers. After a short time Hedlund cut off the interview and asked for a lawyer. The interview was terminated, and Hedlund was placed under arrest.

The property taken from him earlier, including the two watches, was inventoried. At the time of the post-arrest inventory, the evidentiary value of the two watches was not known to the police. It was not until later in the week that McClain's relatives identified the silver-colored pocket watch as being very similar to McClain's pocket watch, which was missing after the burglary. The gold-colored watch had in fact been stolen by Hedlund's sister.

Hedlund argues that the officers exceeded the scope of his consent to search the room when they looked in the dresser drawer, that removal of the watches from the drawer was

an illegal seizure exceeding the necessary scope of the search under the plain view doctrine, that the request by police to have Hedlund take the watches with him to the police station constituted a seizure of the watches by police, and that the watches were seized without probable cause.

### 1. Scope of the search

■ It is undisputed that the search of Hedlund's bedroom was consensual and that Hedlund placed no explicit restrictions on the scope of the search. Thus, the only issue regarding this consensual search is whether there was some implicit limitation that prevented the officers from lawfully looking in the dresser drawer. The standard of review for granting or denying a motion to suppress evidence is abuse of discretion. *State v. Carter*, 145 Ariz. 101, 110, 700 P.2d 488, 497 (1985). We therefore view the evidence in the light most favorable to upholding the trial court's ruling. *State v. Sheko*, 146 Ariz. 140, 141, 704 P.2d 270, 271 (App.1985).

■ A consent to search one's bedroom is not necessarily a *carte blanche* invitation to look anywhere and everywhere. *See State v. Atwood*, 171 Ariz. 576, 618, 832 P.2d 593, 635 (1992), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993); *State v. Paredes*, 167 Ariz. 609, 612, 810 P.2d 607, 610 (App.1991). Neither the record nor any discovered authority supports Hedlund's submission that the search of the drawer was beyond the scope of his consent, although the scope of a consensual search may be implicitly circumscribed. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297 (1991) (scope is generally defined by its expressed object). Contrary to Hedlund's characterization, permission was not limited to a plain view search, which is the concept Hedlund relies on to support his argument of limitation by implication.

The typical plain view search occurs when an officer sees something from a lawful vantage point that is located in a place he has no right to physically search. *See* WAYNE R. LAFAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 3.7(f) (2d ed. 1992). Because Hedlund consented, however, Detective Click had a right to make a reasonable search of the bedroom. *Id.* § 3.1(f) ("if the person responds with a consent which is general and unqualified, then ordinarily the police may conduct a general search of that place"). Because the dresser was in the bedroom, it was not unreasonable for Officer Click to look in the drawers under the unrestricted consent given by Hedlund. *See Jimeno*, 500 U.S. at 251, 111 S.Ct. at 1804 (unqualified consent to search car for narcotics extended beyond the surfaces of the car's interior to paper bag lying on the car's floor). Therefore, the search of the drawer was within the scope of the consent given.

### 2. Seizure of the watches

■ We likewise reject Hedlund's contention that the watches were illegally seized when the police removed them from the drawer and placed them on the dresser. This movement of the watches did not meaningfully interfere with or deprive Hedlund of any possessory interest in the watches. *See Arizona v. Hicks*, 480 U.S. 321, 324, 107 S.Ct. 1149, 1152, 94 L.Ed.2d 347 (1987).

■ Equally unpersuasive is Hedlund's argument that the watches were illegally seized when he put them in his pocket and took them to the police station. It is undisputed, and in fact conceded in Hedlund's brief, that he was asked, not ordered, to go to the police station, and that he was asked, not ordered, to take the watches with him.

### G. Relation of juror to one of the victims

■ After the trial began, a juror learned from her mother that she had once been distantly related to Jim McClain, the second victim. The juror was told that her stepfather's cousin had at one time been married to McClain.

■ This juror was interviewed in the judge's chambers; she stated that she did not know the stepfather's cousin, that her relationship with her stepfather was superficial, and that she believed she could be fair and impartial. Hedlund claims the judge abused his discretion by refusing to dismiss the juror for cause. To prevail on this argument, Hedlund must establish an abuse of discretion with evidence to show that the

juror was biased and could not reasonably render a fair or impartial verdict. *State v. Cocio,* 147 Ariz. 277, 279–80, 709 P.2d 1336, 1338–39 (1985).

Although this juror had been distantly related to McClain, the degree of relation was extremely tenuous and existed only by virtue of two marriages: the marriage of the juror's mother to the juror's stepfather, and the marriage of her stepfather's cousin to McClain. Furthermore, because McClain was no longer married to the stepfather's cousin at the time of his murder, the juror would no longer have been related. There is nothing in the record to indicate that the juror knew the victim or the distant cousin, or that she was untruthful in stating she could be fair and impartial. The judge did not abuse his discretion by refusing to dismiss the juror for cause.

## SENTENCING ISSUES

### A. Summary issues

Hedlund claims that Arizona's death penalty scheme violates the Eighth Amendment because it does not sufficiently channel the trial judge's discretion. We rejected this argument in *State v. West,* 176 Ariz. 432, 454, 862 P.2d 192, 214 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994).

Hedlund also claims that Arizona's death penalty statute violates the Eighth and Fourteenth Amendments because it is cruel and unusual punishment. We disagree. *State v. Hinchey,* 181 Ariz. 307, 315, 890 P.2d 602, 610, *cert. denied,* —— U.S. ——, 116 S.Ct. 528, 133 L.Ed.2d 434 (1995); *accord LaGrand v. Lewis,* 883 F.Supp. 469 (D.Ariz. 1995) (noting that every court to address this issue has upheld the constitutionality of execution by lethal injection).

Hedlund also claims that he was denied his Fourteenth Amendment right to equal protection because he was deprived of a jury trial on aggravating factors in his capital case while defendants in non-capital cases have juries determine aggravating factors. This argument was rejected in *State v. Landrigan,* 176 Ariz. 1, 6, 859 P.2d 111, 116,

*cert. denied,* 510 U.S. 927, 114 S.Ct. 334, 126 L.Ed.2d 279 (1993).

Hedlund argues that a proportionality review of his death sentence is constitutionally required. The United States Supreme Court rejected such a requirement in *Pulley v. Harris,* 465 U.S. 37, 44, 104 S.Ct. 871, 876, 79 L.Ed.2d 29 (1984); we rejected it in *State v. Salazar,* 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992), *cert. denied,* 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993).

### B. Independent review

When the trial court imposes the death sentence, this court conducts a thorough and independent review of the record and of the aggravating and mitigating evidence to determine whether the sentence is justified. *State v. Brewer,* 170 Ariz. 486, 500, 826 P.2d 783, 797, *cert. denied,* 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992).

The trial court weighs aggravating and mitigating circumstances to determine whether the death sentence is warranted. A.R.S. § 13–703. The state must prove aggravating circumstances beyond a reasonable doubt. *See* A.R.S. § 13–703(C); *Brewer,* 170 Ariz. at 500, 826 P.2d at 797. The defendant must prove mitigating circumstances by a preponderance of the evidence, but the trial court may consider evidence that tends to refute a mitigating circumstance. *State v. Lopez,* 174 Ariz. 131, 145, 847 P.2d 1078, 1092 (1992), *cert. denied,* 510 U.S. 894, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993). In weighing, this court considers the quality and the strength, not simply the number, of aggravating or mitigating factors. *State v. Willoughby,* 181 Ariz. 530, 549, 892 P.2d 1319, 1338 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 725, 133 L.Ed.2d 677 (1996).

### 1. Mitigating value of expert testimony

Hedlund claims the trial judge discounted expert psychological testimony offered in mitigation and thus violated his rights to due process and equal protection and against cruel and unusual punishment. We do not agree.

Two psychiatric experts testified for Hedlund. The first was Dr. Holler, whose testi-

mony focused on Hedlund's childhood abuse and the resultant psychoneurological effects. Dr. Holler's evaluation was based on a two-day interview with Hedlund, numerous tests, and background material about Hedlund's childhood.

It is clear from the record that most, if not all, of Dr. Holler's testimony regarding Hedlund's childhood was based on reports he received from other sources and not from his own investigation. Dr. Holler characterized Hedlund as a follower but also said he could sometimes be a leader. He testified that Hedlund's ability to conform his conduct to the law was impaired but that Hedlund knew right from wrong.

Based on reports of others, Dr. Holler also testified about Hedlund's difficult childhood and concluded that Hedlund suffered from post-traumatic stress disorder, alcohol dependence, and a depressive disorder. Cross-examination, however, revealed that Dr. Holler made these diagnoses only after defense counsel told him they would be helpful.

The testimony of Dr. Shaw, the second psychiatric expert, was based on a single interview with Hedlund in 1993, two years following his arrest. Dr. Shaw's testimony related to the effect of Hedlund's alleged alcoholism and Hedlund's judgment at the time of the murders. Based on Hedlund's self-reporting, Dr. Shaw believed that Hedlund would not have been present at the crime scenes had he not been drinking. However, Dr. Shaw could not tell whether the amount of alcohol Hedlund said he regularly consumed was, in fact, consumed on the nights of the murders, whether it was consumed during the other burglaries, or whether there was any consumption at all before the criminal acts. Dr. Shaw was also unable to give an opinion about whether Hedlund could discern right from wrong at the time of the crimes.

Hedlund told Dr. Holler that at age nineteen he was drinking six to twelve and sometimes twenty beers, four or five nights a week. In a presentence report from an unrelated conviction in 1984, when he was nineteen years old, Hedlund stated that he had consumed alcohol in the past but had quit, and that he had quit so long ago that he

could not remember when he had done so. Hedlund's character witnesses testified that Hedlund did not have a drinking problem, was not an alcoholic, and that his level of consumption was far below what Hedlund reported to the psychiatric experts.

Hedlund correctly observes that the trial judge must consider any aspect of his character or record and any circumstance of the offense relevant to determining whether a sentence less severe than the death penalty is appropriate. In considering such material, however, the judge has broad discretion to evaluate expert mental health evidence and to determine the weight and credibility given to it. *State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252, *cert. denied*, —— U.S. ——, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994); *State v. Milke*, 177 Ariz. 118, 128, 865 P.2d 779, 789 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994); *State v. Smith*, 123 Ariz. 231, 243, 599 P.2d 187, 199 (1979). This record does not establish that the judge failed to consider any of the expert psychological testimony, only that he found some of the factual evidence for the experts' opinions lacking in credibility. The judge therefore did not violate Hedlund's constitutional rights by discounting his experts' testimony.

### 2. *Other mitigating circumstances*

Hedlund argues that the trial judge abused his discretion when he did not find the evidence of Hedlund's abusive childhood, dysfunctional family, alcohol-induced impairment, and level of participation in the crime sufficiently mitigating to call for a sentence less than death.

Testimony by Hedlund's friends and relatives shows an abusive childhood. Hedlund was beaten and tormented by his mother, who frequently reminded him of his illegitimacy. The judge specifically found that Hedlund was abused as a child but that the latest episodes of abuse occurred ten to eleven years before the crimes and that there was no evidence of a causal relationship between the abuse and the murders.

A difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted a defendant's ability to perceive, to comprehend, or to control his actions. *See State v. Ross,* 180 Ariz. 598, 607, 886 P.2d 1354, 1363 (1994), *cert. denied,* — U.S. —, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995). No such evidence was offered, and the judge did not err in concluding that Hedlund's family background was not sufficiently mitigating to require a life sentence.

Additionally, there was little evidence corroborating Hedlund's allegation that alcohol impaired his judgment, his ability to tell right from wrong, or his ability to control his behavior. Given the substantial conflicting evidence and nothing other than Hedlund's self-report to one of the psychiatric experts regarding his intoxication at the time of the murders, the judge did not err in rejecting alcoholic impairment as a mitigating circumstance. *See State v. Bible,* 175 Ariz. 549, 605–06, 858 P.2d 1152, 1208–09 (1993), *cert. denied,* — U.S. —, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994).

Hedlund also claims minor participation in the murder, but there is ample evidence pointing to Hedlund as the one who killed Jim McClain. Hedlund's finger and palmprints were on McClain's briefcase, which had been rifled during the burglary and then left behind; his fingerprints were on the magazine of the rifle he had sawed off; the bullet that killed McClain could have come from his rifle; he had modified his rifle to conceal it; he concealed the rifle after the murder; he tried to convince Morris to get rid of the rifle before the police found it; and he expressed remorse after his arrest.

Many facts also indicate Hedlund's major degree of participation in both murders. He knew McKinney had threatened to kill anyone who was at the scene of a burglary; Hedlund had threatened to beat in the head of anyone encountered at the scene of a burglary; he was responsible for hiding the pistol used by McKinney to kill Christene Mertens; and he participated in the attempt to conceal property stolen from McClain and in the sale of the guns stolen from McClain's house.

### 3. Use of second degree murder conviction as an aggravator under A.R.S. § 13–703(F)(2)

#### a. Was there a prior conviction?

Hedlund's jury returned its verdict on all counts on November 12, 1992. Hedlund claims the jury verdict convicting him of the second degree murder of Christene Mertens cannot be a prior conviction for purposes of A.R.S. § 13–703(F)(2)[4] because it was rendered simultaneously with the capital offense verdict. We disagree.

A conviction occurs when the jury renders its verdict. *See State v. Walden,* 183 Ariz. 595, 616, 905 P.2d 974, 995 (1995), *cert. denied,* — U.S. —, 116 S.Ct. 1444, 134 L.Ed.2d 564; *see also State v. Green,* 174 Ariz. 586, 587, 852 P.2d 401, 402 (1993); *State v. Gretzler,* 135 Ariz. 42, 57 n. 2, 659 P.2d 1, 16 n. 2, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) (convictions entered prior to the sentencing hearing may be considered regardless of the order in which the underlying crimes occurred or the order in which the convictions were entered); *State v. Richmond,* 136 Ariz. 312, 318–19, 666 P.2d 57, 63–64, *cert. denied,* 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983). These cases all dealt with A.R.S. § 13–703(F)(1).[5] The guiding principle in all these cases has been that the purpose of a sentencing hearing is to determine the character and propensities of the defendant and impose a sentence that fits the offender. These same principles apply to the (F)(2) factor present in this case. *Walden,* 183 Ariz. at 615–16, 905 P.2d at 994–95. Thus, for purposes of § 13–702(F)(2), Hedlund's second degree murder conviction occurred

---

4. A.R.S. § 13–703(F)(2), at the time of Hedlund's sentencing, provided that when a "defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person," that conviction shall be considered an aggravating circumstance.

5. A.R.S. § 13–703(F)(1) provides that when the "defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was impossible," that conviction shall be considered an aggravating circumstance.

when the jury returned its verdict and was prior to his capital sentencing hearing.

### b. Does the conviction satisfy former § 13–703(F)(2)?

The legislature, not this court, has imposed the duty to "independently review the trial court's findings of aggravation and mitigation and the propriety of the death sentence." A.R.S. § 13–703.01(A). Therefore, despite the dissenting justice's objection to our doing so, we must fulfill our duty under this statute and determine whether Hedlund's conviction for second degree murder qualifies as an aggravating circumstance under § 13–703(F)(2). Was it a conviction for a felony "involving the use or threat of violence on another person"?

■ In determining whether a prior conviction was for a crime of violence, we are bound by the statutory elements of the crime for which the person was convicted and cannot look behind the conviction to determine the true facts of the case. *Walden*, 183 Ariz. at 616, 905 P.2d at 995; *State v. Romanosky*, 162 Ariz. 217, 228, 782 P.2d 693, 704 (1989); *State v. Gillies*, 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983).

In *State v. Arnett*, we defined violence as the "exertion of physical force so as to injure or abuse." 119 Ariz. 38, 51, 579 P.2d 542, 555 (1978). In *State v. Lopez*, we held that a prior conviction for resisting arrest did not death qualify the defendant because conduct that only created a "substantial risk" of physical injury to an officer was not conduct "involving the use or threat of violence." 163 Ariz. 108, 114, 786 P.2d 959, 965 (1990). In other words, under the resisting arrest statute, Lopez could have been convicted for acting recklessly—conduct that disregards the "substantial and unjustifiable risk" of harm. *See* A.R.S. § 13–105(c).

The same year that we decided *Lopez*, we held in *State v. Fierro* that the defendant's Texas robbery conviction was not a crime of violence. 166 Ariz. 539, 549, 804 P.2d 72, 82 (1990). We reached this conclusion after pointing out that according to the Texas robbery statute underlying Fierro's conviction, "violence is not necessary," and a person commits robbery if, in the course of committing theft, he "intentionally, knowingly, *or recklessly* causes bodily injury to another." *Id.* (quoting Texas Penal Code Ann. § 19.02 and 1972 Texas Practice Commentary) (emphasis added).

■ The reason for holdings such as *Lopez* and *Fierro*, rejecting prior convictions based on conduct that is less than knowing or intentional, is straightforward: The legislature intended that the aggravating circumstances contained in § 13–703 be used to narrow the class of death-eligible defendants. *Brewer*, 170 Ariz. at 500, 826 P.2d at 797. Thus, the statutory factors are interpreted and applied in a manner that narrows the class of those who are most deserving of that ultimate sanction. *Id.* We further that purpose by defining the crimes of violence that qualify as an aggravating circumstances under § 13–703(F)(2) to exclude those committed with a mental state that was merely reckless or negligent. This principle, of course, was recognized just last year by today's dissenter in *Walden*, in which he stated that "violence requires an intent to injure or abuse." 183 Ariz. at 617, 905 P.2d at 996. In *Walden*, this court held that a conviction that could have been obtained for merely reckless conduct did not qualify as a prior under the (F)(2) factor. *Id.*

The dissent characterizes *Fierro* as "engrafting" a culpable mental state onto § 13–703(F)(2). Dissent at 588, 917 P.2d at 1235. But it did not. To assert, as the dissent does, that the "legislature did not limit the application of A.R.S. § 13–703(F)(2) to crimes with any particular culpable mental state" presupposes that violence encompasses any and all crimes that result in injury or abuse, even those resulting from reckless or negligent conduct. *See* dissent at 588, 917 P.2d at 1235. It does not. The legislature used the more narrow phrase we find in § 13–703(F)(2), not the phrase "crime causing or risking physical injury."

Other authorities have recognized not only the distinction between violence and non-intentional, non-knowing acts resulting in harm, but also the inherently intentional or knowing element of violence. In *Morris & Co. v. Industrial Board*, 284 Ill. 67, 119 N.E.

582

944, 946 (1918), the court construed a statute that empowered the coroner's jury to investigate when the deceased "is supposed to have come to his or her death by violence, casualty, or any undue means." The *Morris* court noted that "casualty" was defined as "chance, accident, contingency; also that which comes *without design* [(not intended)] or *without being foreseen* [(not knowing)]," and pointed out that there must be a distinction between "casualty" and "violence," otherwise the term casualty would not have been needed in the statute. *Id.* (emphasis added).

More on point, in construing a riot statute, the Illinois Supreme Court stated that the words "force" and "violence" do not contemplate merely the manual force necessary to commit the act, but were intended to be construed in the light of the common law, under which "force" or "violence" meant a concerted *intent* of the perpetrators to assist one another against those who would resist them. *Walter v. Northern Ins. Co.*, 370 Ill. 283, 18 N.E.2d 906, 908 (1938). The Georgia Supreme Court has also recognized a distinction between death caused by violence and that caused by accident. *Jackson v. State*, 210 Ga. 303, 79 S.E.2d 812, 816 (1954). In *Landry v. Daley*, the court stated that "the use of force or violence carries with it *sub silentio* a destructive or threatening intent." 280 F.Supp. 938, 955 (N.D.Ill.1968), *rev'd on other grounds*, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971).

More recently, and in a context more closely resembling *Fierro*, the Texas Court of Criminal Appeals had occasion to construe the word "violence" in a statute prohibiting the possession of firearms by persons convicted of a felony "involving an act of violence or threatened violence...." *Hamilton v. State*, 676 S.W.2d 120, 121 (Tex.Cr.App.1984). The court concluded that "violence inheres, not in the result, but in the *intent* and the act." *Id.* (emphasis added). The same court later elaborated on the definition, stating:

> in determining if an act of violence has occurred, the focus must be on the intent

of the actor and the concurrence between that mental state and the act which creates the injury. The clear holding of *Hamilton* requires that any crime which involves an "act of violence" is by definition one which requires a culpable mental state on the part of the offender.

*Ware v. State*, 749 S.W.2d 852, 854 (Tex.Cr. App.1988). Thus, *Fierro* did nothing more than articulate the inherent culpable mental state of violence that other courts have long recognized. We turn then to decide whether Hedlund's prior conviction for second degree murder is an aggravating circumstance under § 13–703(F)(2).

 Hedlund was charged with first degree murder, but the jury was instructed on second degree murder as a lesser included offense. The jury instructions on this offense contained language setting forth all the statutory elements and degrees of the crime, which include the following:

A. A person commits second degree murder if without premeditation:

1. [Such person intentionally causes another's death]; or

2. [Engages in conduct knowing it will cause another's death or serious injury and in fact causes another's death]; or

3. Under circumstances manifesting extreme indifference to human life, such person *recklessly* engages in conduct which creates a grave risk of death and thereby causes the death of another person.

A.R.S. § 13–1104(A) (emphasis added). Hedlund's jury returned a general verdict. Thus, under the charge to the jury and its verdict, it is possible that Hedlund was convicted under the third subsection, a statutory element that permits a finding of guilt when the defendant engages in reckless conduct.

Because Hedlund's prior conviction was for a crime that, on the face of the statute, might have been committed recklessly, it does not qualify as a crime of violence.[6] In A.R.S.

---

6. This problem has been mooted by the recent amendment of A.R.S. § 13–703(F)(2). This section of the statute mandates finding an aggravating circumstance when:

The defendant was previously convicted of a serious offense, whether preparatory or completed.

§ 13–703(D)(2), the legislature used the term "violence," not the phrase "conviction for a crime which resulted in or threatened physical injury." Accordingly, Hedlund's second degree murder conviction cannot be an aggravating circumstance for purposes of former § 13–703(F)(2).

Because the dissent mischaracterizes our holding, we must emphasize that we did not hold in *Fierro, Lopez,* and *Walden,* and do not hold today, that prior convictions for first degree murder under A.R.S. § 13–1105, second degree murder committed with an intentional or knowing *mens rea* under § 13–1104(A), manslaughter committed with a *mens rea* of intentional or knowing under § 13–1103, assault committed with an intentional or knowing *mens rea* under § 13–1203, aggravated assault committed with an intentional or knowing *mens rea* under § 13–1204, sexual abuse under § 13–1404, or sexual assault under § 13–1406 cannot be an aggravating circumstance under former § 13–703(F)(2).[7]

Hedlund's prior conviction is not disqualified merely because the statutory definition of the crime permits it to be committed with a reckless mental state. It is disqualified because the instructions and the non-specific form of verdict used in his case did not narrow the mental state of the charge; thus, it is possible that his conviction was based on a reckless mental state. Had Hedlund's instructions or form of verdict specified that the mental state for his second degree murder conviction was based on either an intentional or knowing *mens rea,* the conviction would have qualified, regardless of the fact that the crime's statutory definition allows for conviction under a lesser mental state. *Walden,* 183 Ariz. at 617, 905 P.2d at 996 (sufficiently specific jury instructions made kidnapping charge one that satisfied definition of violence).

For reasons quite unclear, the dissent also insists on expanding our holding. To prevent confusion, we restate that holding. Under *Gillies, Fierro, Lopez,* and *Walden,* prior convictions obtained by a procedure such as was followed in this case, so that they could have been based on conduct that was merely reckless or negligent, do not qualify under § 13–703(F)(2) as prior crimes of violence. Convictions obtained under statutes criminalizing conduct that was intentional or knowing, and by a procedure establishing that the conviction was based on one of these levels of culpability, can qualify.

Thus, defendants who committed prior crimes, including first and second degree murder, manslaughter, aggravated assault, robbery, and a host of others, while acting intentionally or knowingly, can be death eligible; those defendants who acted only recklessly or negligently are not. We neither expand on *Fierro, Lopez,* and *Walden* nor retreat from them. In this opinion there is only an independent review as required by statute and application of settled law; there is neither syllogism, major premise, nor minor premise. *See* dissent at 41–42.

The state, aware of our duty of independent review and well aware of the *Fierro/Walden* rule, made no request in this proceeding that these cases be overruled. The dissent argues we should do so *sua sponte.* We refuse. As the dissent says, advocacy has its limits. Dissent at 589, 917 P.2d at 1236.

One final point. The dissent accuses the court of opening the floodgates for Rule 32 petitions. We invite no petitions based on the dissent's construction of this opinion. As noted, we go no further than *Fierro,* decided six years ago. Any flood caused by that decision has failed to reach our court.

### 4. *Pecuniary gain*

Simply receiving profit as the result of a murder is not enough to satisfy the requirements of § 13–703(F)(5), but killing

---

A "serious offense" is defined by A.R.S. § 13–703(H) as any of a list of specific crimes, which now includes second degree murder in any of its degrees. *See* A.R.S. § 13–703(H)(2).

**7.** We note that the legislature has amended § 13–703(F)(2); in doing so, it disqualified some of the entries in the dissent's parade of horribles. Assault, attempted assault, several forms of aggravated assault, as well as attempted murder and sexual abuse, are not included in the list of serious offenses in § 13–703(H).

for the purpose of financial gain is sufficient. *See State v. White,* 168 Ariz. 500, 511, 815 P.2d 869, 880 (1991), *cert. denied,* 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992). Both of these murders were committed in the course of an ongoing burglary spree. The purpose of the burglaries was to find cash or property to fence. Items stolen from the McClain residence were in fact sold. Clearly, the evidence of pecuniary gain as the primary, if not sole, purpose of the murders is overwhelming and inescapable. Thus, we affirm the finding that Hedlund murdered for pecuniary gain.

### 5. Reweighing

■ We have concluded that the trial judge erred in finding Hedlund had a prior conviction for a felony involving violence and agree with the finding of the (F)(5) aggravating circumstance. Therefore, we reweigh the aggravating and mitigating circumstances. *See Bible,* 175 Ariz. at 606–09, 858 P.2d at 1209–12. Because the judge did not improperly exclude mitigating evidence at sentencing and the mitigating evidence is not of great weight, this case is appropriate for reweighing by this court rather than remanding to the trial court. *State v. King,* 180 Ariz. 268, 288, 883 P.2d 1024, 1044 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995). In our reweighing, we must decide whether the sole aggravator— pecuniary gain—outweighs the mitigating circumstances discussed above or whether those mitigators are sufficiently substantial to call for leniency.

■ In comparison to the mitigating circumstances here, the quality of the aggravating circumstance is great. To apply a recent analogy, this is not the case of a convenience store robbery gone bad but, rather, one in which pecuniary gain was the catalyst for the entire chain of events leading to the murders. The possibility of murder was discussed and recognized as being a fully acceptable contingency. *See State v. Spears,* 184 Ariz. 277, 908 P.2d 1062 (1996) (affirming death sentence where pecuniary gain was only aggravator, and military service and lack of significant prior criminal record were only mitigators).[8]

As in *Spears,* this is a case in which Defendants deliberately and unnecessarily killed to accomplish the burglary. We have encountered pecuniary gain as the sole aggravator in other cases[9] in which the death penalty was not imposed, but the quality of Hedlund's conduct in this case certainly gives great weight to the aggravating circumstance. We therefore believe that the aggravating circumstance of pecuniary gain clearly outweighs the minimal mitigating evidence.

### 6. The special verdict

■ Hedlund claims that the trial judge's failure to issue a written special verdict, separate from the special verdict read into the record at the time of sentencing, violates A.R.S. § 13–703(D) and requires resentencing. We disagree.

This court has stated that the better practice is for the trial court to place the special verdict on the record, which the judge in this case did by reading it in open court, on the record. *State v. Hill,* 174 Ariz. 313, 330, 848 P.2d 1375, 1392, *cert. denied,* —— U.S. ——, 114 S.Ct. 268, 126 L.Ed.2d 219 (1993); *State v. Wallace,* 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), *cert. denied,* 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990). *State v. Beaty,* 158 Ariz. 232, 246, 762 P.2d 519, 533 (1988), *cert. denied,* 491 U.S. 910, 109 S.Ct.

---

**8.** *See also Willoughby,* 181 Ariz. at 549, 892 P.2d at 1338 (affirming death sentence where pecuniary gain was only aggravator but was extremely compelling and overshadowed substantial mitigating evidence); *White,* 168 Ariz. at 510–13, 815 P.2d at 879–82 (1991) (affirming death sentence where pecuniary gain was only aggravator and lack of felony record was only mitigator); *State v. Hensley,* 142 Ariz. 598, 603–04, 691 P.2d 689, 694–95 (1984) (affirming death sentence where pecuniary gain was only aggravator and defendant's G.E.D. degree was only mitigator).

**9.** *State v. Rockwell,* 161 Ariz. 5, 775 P.2d 1069 (1989) (reducing sentence to life imprisonment where pecuniary gain was sole aggravator but mitigation was great); *State v. Marlow,* 163 Ariz. 65, 72, 786 P.2d 395, 402 (1989) (where same evidence was used to support both pecuniary gain and heinous and depraved, it can be weighed only once; thus only one aggravating factor could be weighed against substantial mitigating evidence, making life imprisonment the appropriate sentence).

3200, 105 L.Ed.2d 708 (1989); There is no allegation that the transcript is inaccurate or that any prejudice resulted from the verdict being read into the record rather than filed separately. Neither the text of A.R.S. § 13–703(D) nor the cases construing it require a separately filed, written special verdict.

### State v. McKinney
### CLAIMS OF TRIAL ERROR

#### A. The courtroom layout

■ McKinney claims that the courtroom layout, with Defendants facing the jurors, was intimidating and resulted in fundamental error requiring reversal. McKinney has not demonstrated any prejudice and provides no authority for his argument that there is a constitutional right to a standard American courtroom arrangement, and we decline to invent such a right.

#### B. Denial of impeachment

McKinney next claims that the trial judge erred in refusing to allow Lemon to be impeached with a prior felony conviction. This claim and the supporting argument duplicate Hedlund's claim regarding Lemon's juvenile record. The only difference is that McKinney attempts to characterize it as a prior felony conviction. We reject McKinney's argument on this issue for the same reasons we did in Hedlund's case.

#### C. The expert status of witnesses

The state called several witnesses with expertise in areas such as fingerprinting, forensic pathology, and other specialized fields. After counsel established a proper foundation, the witnesses were submitted to the court as experts.[10] There was no objection to this submission at trial, but on appeal McKinney contends that the judge conferred expert status on the witnesses, thus making an improper comment on the evidence.

McKinney argues that the "judge has no business telling jurors who he believes should be considered an expert [because] [t]hat decision is the jury's."

■ As we have previously stated, the primary concern in admitting so-called expert testimony is whether the subject matter of the testimony is beyond the common experience of people of ordinary education, so that the opinions of experts would assist the trier of fact. *State v. Dixon*, 153 Ariz. 151, 155, 735 P.2d 761, 765 (1987). "Whether a witness is competent to testify as an expert is a matter primarily for the trial court and largely within its discretion." *Id.*

■ Here, the witnesses' credentials and qualifications to give such testimony were established, the prosecutor submitted the witnesses as experts, and after defense counsel stated they had no objection, the judge allowed them to give factual and opinion testimony in their respective subject areas. The witnesses' testimony concerned technical and scientific subjects beyond the common experience of people of ordinary education. Thus, we find no abuse of discretion in the judge's admission of the witnesses' opinion testimony.

We do not recommend, however, the process of submitting a witness as an expert. The trial judge does not decide whether the witness is actually an expert but only whether the witness is "qualified as an expert by knowledge, skill, experience, training, or education ... [to] testify ... in the form of an opinion or otherwise." Ariz.R.Evid. 702. By submitting the witness as an expert in the presence of the jury, counsel may make it appear that he or she is seeking the judge's endorsement that the witness is to be considered an expert. The trial judge, of course, does not endorse the witness's status but only determines whether a sufficient foundation has been laid in terms of qualification for

---

10. After eliciting information on the experts' credentials, the prosecutor submitted them as experts in their respective areas. Illustrative of this practice is the following excerpt from the trial.

> Q. [PROSECUTOR] Your Honor, I submit Mr. Kowalski as an expert in the area of criminalistics.
>
> [McKINNEY'S COUNSEL] No objection.
> [HEDLUND'S COUNSEL] No objection.
> [THE COURT] Okay. You may proceed.
> This manner of submitting and approving experts was the same for all of the testifying experts.

the witness to give opinion or technical testimony. *See United States v. Bartley*, 855 F.2d 547, 552 (8th Cir.1988) ("Although it is for the court to determine whether a witness is qualified to testify as an expert, there is no requirement that the court specifically make that finding in open court upon proffer of the offering party").

■ In our view, the trial judge should discourage procedures that may make it appear that the court endorses the expert status of the witness. The strategic value of the process is quite apparent but entirely improper. Suppose, as is frequently the case, there are two experts with conflicting opinions. Is the trial judge to endorse them both or only one? In our view, the answer is neither. The trial judge is only to determine whether one or the other or both are qualified to give opinion or technical evidence. "Such an offer and finding [of expert status] by the Court might influence the jury in its evaluation of the expert and the better procedure is to avoid an acknowledgement of the witnesses' expertise by the Court." *Id.* Thus, we disapprove of the procedure followed in this case. However, no objection was made, and the issue falls far short of fundamental error. *See State v. Gendron,* 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991).

## D. The verdict

■ The gravamen of McKinney's argument on this point is that the failure to announce the verdict orally in his presence violated his right to a public and open trial under art. II, §§ 11 and 24 of the Arizona Constitution and the Sixth Amendment to the United States Constitution.

The two juries were not sequestered, so it was possible that the deliberations of one could continue well past the verdict and discharge of the other. To ensure that the jury that deliberated longer would not be influenced by the first jury's verdict, the procedure for this dual jury trial worked as follows: When McKinney's jury returned its verdict, the form was taken by the bailiff to the clerk, who read it silently and recorded it. McKinney was present to observe this process, as were the attorneys for both defendants. After the attorneys were called to

the bench to review the verdict, the bailiff gave the verdict forms to the jurors, who were polled in McKinney's presence to ensure that the returned verdict was that which they had voted for, but the actual verdict was not orally announced. McKinney's jury was then dismissed. When Hedlund's jury later reached its verdict, that verdict was announced in the normal course, following which the clerk read aloud the previously returned verdict for McKinney.

While McKinney was present for the return of his verdict, he was then sent back to jail for security reasons; neither he nor his jury was present when his verdict was subsequently read aloud following the reading of Hedlund's verdict. McKinney argues that because he was not present when his jury's verdict was orally announced, his verdict was a secret verdict, denying his rights to due process, open justice, and a public trial in violation of an assortment of constitutional provisions and court rules. On appeal, McKinney asks this court to believe that despite the fact his attorney read the verdict and the jury was polled while he sat in court, his rights were violated because he did not know, and his lawyer did not tell him, that he had been convicted of first degree murder. We decline to indulge in such fantasy.

McKinney also argues that the procedure outlined above did not constitute the return of an actual verdict. We disagree. Our rules require that verdicts "shall be in writing, signed by the foreman, and returned to the judge in open court." Ariz.R.Crim.P. 23.1(a). McKinney had an open and public trial, as required by the Arizona and United States Constitutions. The verdict was in writing, signed by the foreman, and returned to the judge in open court, as required by our Rules of Criminal Procedure. McKinney was present at all times, including the return of the verdict and polling of the jury. This is all he is entitled to by law. Therefore, we reject McKinney's claim of error regarding the verdict procedure.

## SENTENCING ISSUES

### A. The special verdict

This claim, and the supporting argument, duplicates Hedlund's claim regarding the ab-

sence of a written special verdict. As in Hedlund's sentencing, the judge read McKinney's special verdict in open court and it was made part of the record. We reject McKinney's claim of error on this point for the same reasons we rejected Hedlund's claim.

## B. The mitigating value of childhood abuse

■ McKinney asserts that executing him would be cruel and unusual punishment because his childhood abuse caused him to commit murder. McKinney offered evidence from several witnesses that he, like Hedlund, endured a terrible childhood. The judge found as a fact that McKinney had an abusive childhood.

Here again, the record shows that the judge gave full consideration to McKinney's childhood and the expert testimony regarding the effects of that childhood, specifically the diagnosis of post-traumatic stress disorder (PTSD). Assuming the diagnoses were correct, the judge found that none of the experts testified to, and none of the evidence showed, that such conditions in any way significantly impaired McKinney's ability to conform his conduct to the law. The judge noted that McKinney was competent enough to have engaged in extensive and detailed pre-planning of the crimes. McKinney's expert testified that persons with PTSD tended to avoid engaging in stressful situations, such as these burglaries and murders, which are likely to trigger symptoms of the syndrome. The judge observed that McKinney's conduct in engaging in the crimes was counter to the behavior McKinney's expert described as expected for people with PTSD. As we noted in discussing Hedlund's claim on this same issue, a difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted the defendant's ability to perceive, comprehend, or control his actions. *See State v. Ross*, 180 Ariz. 598, 607, 886 P.2d 1354, 1363

(1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995).

The record clearly shows that the judge considered McKinney's abusive childhood and its impact on his behavior and ability to conform his conduct and found it insufficiently mitigating to call for leniency. On this record there was no error.

## DISPOSITION

Having considered all claims made by Defendants and concluding they are all without merit, and having independently reviewed the record in both cases for fundamental error and finding none, the convictions and sentences of Defendants are affirmed in all respects.

ZLAKET, V.C.J., MOELLER, J., and ROBERT J. CORCORAN, J. (retired), concur.

MARTONE, Justice, dissenting in part.

I join the court in affirming the judgment of conviction and sentence of death but, unlike the majority, I believe that murder is a crime of violence. Because its conclusion cannot be sound, the court should reexamine its premises to find where the defect in reasoning lies. I conclude that the court's decision and dicta in *State v. Fierro*, 166 Ariz. 539, 549, 804 P.2d 72, 82 (1991), are plainly wrong. *Fierro* is a serious departure from the statute it purports to construe.

We first examine the majority's analysis. To begin with, not even the defendant argues that second degree murder is not a crime of violence. He only argues that his second degree murder conviction was not a "previous" conviction within the meaning of § 13–703(F)(2). After concluding that Hedlund was previously convicted within the meaning of the statute, the majority *sua sponte* imposes upon itself the duty to decide whether that conviction involved the use or threat of violence on another person. *Ante*, at 581, 917 P.2d 1228.[1]

---

1. Our independent review extends to "the *facts* that establish the presence or absence of aggravating and mitigating circumstances." *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976) (emphasis added). It does not extend to a consideration of *legal* issues not raised by the parties at trial and on appeal. *State v. Stuard*, 176 Ariz 589, 611, 863 P.2d 881, 903 (1993) (Martone, J., dissenting). We take the case as we find it.

The majority uses the following syllogism. Its major premise is that a crime that can be committed with a culpable mental state of reckless cannot be a crime of violence within the meaning of § 13–703(F)(2). It relies upon *Fierro*. Its minor premise is that second degree murder can be committed with the culpable mental state of reckless. A.R.S. § 13–1104(A)(3). Therefore, it concludes that second degree murder is not a crime of violence.

The court's major premise is false. The legislature did not limit the application of A.R.S. § 13–703(F)(2) to crimes with any particular culpable mental state. Subsection (F)(2) reads as follows:

> the defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person.

Note that the statute does not include the words "intentionally," "knowingly," "recklessly," or "negligently." Culpable mental state is simply not relevant under this statute. If the crime involves the use or threat of violence on a person, it qualifies.

Our cases were once consistent with the plain meaning of the statute. In *State v. Arnett*, 119 Ariz. 38, 51, 579 P.2d 542, 555 (1978), in construing the word "violence," we turned to the dictionary. We said that violence was the "exertion of any physical force so as to injure or abuse." *Id.* We made no reference to any culpable mental state. We just gave the statute its plain meaning. In *State v. Watson*, 120 Ariz. 441, 448, 586 P.2d 1253, 1260 (1978), we said that robbery was a crime of violence because "fear of force is an element of robbery and that conviction of robbery presumes that such fear was present." In *State v. Romanosky*, 162 Ariz. 217, 227, 782 P.2d 693, 703 (1989), we said "[i]f either force or fear is a required element of the crime for which the defendant was previously convicted, it is conclusively presumed that the conviction encompassed force or fear." We said nothing about culpable mental state. We said the same as recently as *State v. Spencer*, 176 Ariz. 36, 43, 859 P.2d 146, 153 (1993).

From whence then did this engrafting of culpable mental state on an otherwise plain statute come? Turn to *State v. Fierro*, 166 Ariz. 539, 804 P.2d 72 (1991). It quotes the *Arnett* definition of violence, but then departs from it with the now infamous sentence, "[i]n determining whether a defendant's prior convictions under § 13–703(F)(2) warrant aggravating a life sentence to death, only those felony convictions in which force was employed or threatened *with the intent to injure or abuse will be considered in aggravation.*" *Id.* at 549, 804 P.2d at 82 (emphasis added). This sentence was followed by a *cf.* cite to *State v. Lopez*, 163 Ariz. 108, 114, 786 P.2d 959, 965 (1990). The use of the *cf.* cite is a frank acknowledgement that there is no clear support for the proposition. *"Cf."* means that the "[c]ited authority *supports a proposition different from the main proposition but sufficiently analogous to lend support.* Literally, '*cf.*' means 'compare.'" *The Blue Book: A Uniform System of Citation* at 23 (15th ed.1991) (emphasis in original). *Lopez* only held that under an alternative definition of resisting arrest, the offense could be committed without the use or threat of violence. There was no discussion of culpable mental state and certainly no reference to "with intent to."

*Fierro* went on to hold that because in Texas aggravated assault and robbery could be committed with a culpable mental state of less than intent (there reckless), those crimes did not satisfy § 13–703(F)(2). *Fierro*, 166 Ariz. at 549, 804 P.2d at 82.

*Fierro* thus defined the (F)(2) factor almost out of existence. This was so because under *State v. Gillies*, 135 Ariz. 500, 662 P.2d 1007 (1983), the court held that the prior conviction must have been for a felony which by its statutory definition involves violence or the threat of violence. *Id.* at 511, 662 P.2d at 1018. One could not look at the specific facts of the case.

When you add *Fierro* to *Gillies*, the result is absurdity. For example, one is forced to reach the quite remarkable proposition that first degree murder is not a crime of violence. Under A.R.S. § 13–1105(A), first degree murder is committed if "[i]ntending or *knowing* that his conduct will cause death, such person causes the death of another with

premeditation." Under the majority's analysis, because first degree murder can be committed "knowingly," and without intent, first degree murder would not constitute a crime of violence.[2] For the same reason, second degree murder would not be a crime of violence. *See* A.R.S. § 13–1104. Manslaughter would not be a crime of violence. *See* A.R.S. § 13–1103. Aggravated assault would not be a crime of violence. *See* A.R.S. § 13–1204. Assault would not be a crime of violence. *See* A.R.S. § 13–1203. Sexual Assault would not be a crime of violence. *State v. Bible,* 175 Ariz. 549, 604, 858 P.2d 1152, 1207 (1993); *see* A.R.S. § 13–1406. Sexual Abuse would not be a crime of violence. *See* A.R.S. § 13–1404. And yet attempted murder and attempted assault would be crimes of violence because "intent" is an element of the offense of attempt. *See* A.R.S. § 13–1001.

When a court reaches remarkable conclusions such as these, we have a choice. We can accept absurd results or we can go back and reevaluate our premises. I would simply acknowledge *Fierro* as insupportable error, acknowledge our distraction in post-*Fierro* cases, including my own opinion in *State v. Walden,* 183 Ariz. 595, 616–18, 905 P.2d 974, 995–97 (1995), acknowledge that its application to second degree murder and first degree murder is absurd, and hold that murder is simply a crime of violence. Those who have profited by *Fierro* in the past will suffer no harm. Those who do not profit by it in present and future cases are entitled to no benefit from it. Instead, the court says *it* must narrow the class of defendants who are death eligible. *Ante,* at 581, 917 P.2d at 1228. But it is the statute that narrows the class. The court ends up eliminating the narrowing factor.

I fear that the court's refusal to acknowledge our prior error will simply open the floodgates of Rule 32 petitions in those many cases in which the (F)(2) factor was upheld without any consideration of culpable mental state. This is especially regrettable in light of the repeal of the old (F)(2) factor and the substitution of the new and improved "seri-

ous offense" (F)(2) factor. A.R.S. § 13–703(F)(2), *amended by* Laws 1993, Ch. 153, § 1.

The soundness of legal reasoning gives law its legitimacy. Unsound results flow from unsound reasoning. Not even the defendant took the position that second degree murder was not a crime of violence. Advocacy, after all, has its limits. I respectfully dissent from that part of the opinion that concludes that murder is not a crime of violence.

---

**2.** The majority's attempt to limit *Fierro*'s damage at the point of "reckless" has no support in

*Fierro* or our cases.